**Philip HANDELMAN and Esther Handelman, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 37, Docket 74–1166.**

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1974.

Decided Jan. 27, 1975.

Stephen M. Gelber, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Jonathan S. Cohen, Tax Div., Dept. of Justice, of counsel), for appellant.

Robert M. Trien, New York City, for appellees.

Before KAUFMAN, Chief Judge, and ANDERSON and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This is an appeal by the Commissioner of Internal Revenue from an adverse decision of the United States Tax Court, William H. Quealy, Judge, according capital gains treatment to $95,000 received by the taxpayers in connection with the purported sale of stock of Graphic Arts Exhibit Building, Inc. (Graphic Arts), and allowing taxpayers to deduct 60 per cent of their expenses incurred in connection with the maintenance and operation of a 46-foot sailing sloop during the taxable years 1963 to 1965, inclusive, as entertainment expense in connection with taxpayer Philip Handelman's business, the practice of law.[1] We disagree with the Tax Court in both respects as a matter of law and accordingly reverse the judgment.

On or about January 20, 1961, taxpayer caused Graphic Arts to be organized under New York law for the purpose of constructing and leasing space in a building at the site of the New York World's Fair which was to be held in 1964–65. Apparently taxpayer had obtained a commitment for a particular lot on the World's Fair grounds on which a graphic arts pavilion was to be built. In June, 1961, an agreement was entered into with Thomas R. O'Connor providing that O'Connor was to be employed by Graphic Arts in exchange for advancing working capital in the amount of about $100,000, with the understanding that he was to acquire some stock in the corporation. Subsequently O'Connor, acting on behalf of himself and of his partner and financial backer, Joan G. Van de Maele, offered to purchase all of the stock of the Graphic Arts corporation. During 1961 Van de Maele paid Handelman $25,000 which he incidentally originally reported as ordinary income from his legal practice. In December, 1961, it was agreed that O'Connor and Van de Maele would buy 59 shares of Graphic Arts stock owned by the taxpayer and 24 shares belonging to a Dr. A. Alfred Solomon. Van de Maele accordingly executed on December 8, 1961, two notes payable to taxpayer on June 8, 1962, in the amounts of $50,000 and $17,000. Van de Maele and O'Connor also executed a note in the amount of $48,000 payable to Dr. Solomon. On February 20, 1962, and thereafter on March 26, 1962, Van de Maele made additional payments to taxpayer in the amounts of $30,000 and $40,000, respectively. These amounts were *not* applied in reduction of the two notes payable to taxpayer which had been executed in December, 1961. When the notes were presented for payment on June 8, 1962, they were returned unsatisfied.

---

1. Esther Handelman is an appellee and was a petitioner below solely by virtue of having filed a joint return with her husband; accordingly references throughout this opinion to "taxpayer" are to Philip Handelman.

Thereafter, by an agreement between the taxpayer and O'Connor dated June 13, 1962, O'Connor and Van de Maele jointly executed an additional note in the amount of $59,000, payable September 14, 1962, and it was provided that 88 shares of Graphic Arts stock, not the previous total of 83 shares, would be held in escrow, 63 shares to be delivered to O'Connor upon payment of the original notes of $50,000 and $17,000 payable to the taxpayer and $48,000 payable to Dr. Solomon. The remaining 25 shares were to be delivered after payment of the additional note of $59,000 executed on June 13, 1962. The terms of the agreement provided that the voting rights of the stock were to remain with taxpayer during the escrow and that in the event the notes were not paid by the closing date the stock was to be returned to him. The notes were not in fact paid. The escrow was accordingly terminated and the stock returned to taxpayer. He thereupon also became entitled to retain the original $25,000 payment made to him in 1961 by Van de Maele. This, together with the $70,000 cash received in February and March, 1962, made up the $95,000 here in question.

Thereafter on or about March 14, 1963, a second escrow arrangement was entered into under terms differing from those of the escrow agreement of June 13, 1962. Under the March 14, 1963, agreement, the taxpayer deposited 104 shares of Graphic Arts stock, 16 more shares than were covered by the agreement of June 13, 1962, and was to receive $150,000 or $24,000 more than was payable to him by virtue of the two notes of December, 1961, and the one note of June 13, 1962. This new escrow arrangement did not include the shares of Graphic Arts stock held by Dr. Solomon which had been included in the earlier escrow agreement. This arrangement was extended by still another escrow dated March 20, 1963, also providing that the stock was to be returned in the event payment was not made to the taxpayer. The payments were not in

fact made and the escrow was terminated.

Thereafter taxpayer initiated an action against O'Connor and Van de Maele, not upon any purportedly enforceable contract of sale, but upon the three notes payable to him in the aggregate amount of $126,000 (i. e., $50,000, $17,000 and $59,000, respectively), also seeking, however, an additional $24,000 which was to have been paid under the escrow arrangement of March, 1963. Van de Maele and O'Connor in their answer in the Supreme Court of the State of New York asserted in defense the clauses of the escrow agreements of June 13, 1962, and March 14, 1963, directing the return of the stock and claimed that these provisions comported with an oral understanding of the parties to the effect that any agreement to purchase the stock would be cancelled if Van de Maele were unable to satisfy the notes. The state court held that this defense was insufficient and that parol evidence was impermissible to raise a defeasance provision in derogation of the unconditional terms of the promissory notes but denied taxpayer's motion for summary judgment insofar as it related to the additional $24,000, as "not proved by document." Meanwhile, the corporation had never erected any building, and, indeed, it defaulted on its lease of the business site and subsequently, in 1965, was dissolved by proclamation by the Secretary of State of New York for nonpayment of taxes.

Ultimately, in April, 1971, the litigation brought by taxpayer against Van de Maele and O'Connor was settled, with the partners paying taxpayer an additional $89,500 (not here in question) in return for a general release, the three notes held by him and certificates representing 64 shares of the then totally defunct Graphic Arts stock.

The question, thus, is whether there was a "sale or exchange" within the meaning of § 1222(3) [2] of the Internal Revenue Code, 26 U.S.C. § 1222(3), so

**2.** 26 U.S.C. § 1222:

    (3) Long-term capital gain.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held

for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

that the $95,000 received by taxpayer was long-term capital gain therefrom.

Taxpayer does not really dispute the proposition that whether a sale or exchange occurred involves "the legal characterization, for federal income tax purposes, of the transactions between the parties" which is "not a question of fact, but rather one of law" fully reviewable by us on appeal. Union Planters National Bank of Memphis v. United States, 426 F.2d 115, 117 (6th Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

■ Where a seller receives payment but retains control and dominion over the capital asset so that the agreement remains executory and is ultimately uncompleted, he cannot obtain the benefit of the capital gains provision of the Code. Mittleman v. Commissioner, 56 T.C. 171, 178–179 (1971), aff'd, 464 F.2d 1393 (3d Cir. 1972) (per curiam) (advance on purchase of stock retained by seller when purchaser withdrew treated as ordinary income); Smith v. Commissioner, 50 T.C. 273 (1968), aff'd, 418 F.2d 573 (9th Cir. 1969) (per curiam) (deposit on contract to purchase stock treated as ordinary income to seller when purchase not completed); Binns v. United States, 385 F.2d 159 (6th Cir. 1967) (amount of down payment retained by seller when buyer failed to complete purchase of stock was ordinary income although stock was escrowed, despite absence of liquidated damage provision); Melone v. Commissioner, 45 T.C. 501 (1966) (amount received by seller on settlement of litigation over buyer's failure to complete purchase of residential property treated as ordinary income because seller regained possession upon default and sale not completed); Boatman v. Commissioner, 32 T.C. 1188, 1192 (1959) (amount received by seller from settlement entered into when agreement for sale of farm not completed treated as ordinary income since no sale or exchange occurred); Johnson v. Commissioner, 32 B.T.A. 156, 161 (1935) (amount received by seller when purchaser failed to complete purchase of stock treated as ordinary income).

■ Here Van de Maele and O'Connor entered into executory agreements, but none of these was ever consummated. Taxpayer retained all the voting rights to the stock, one circumstance indicating that a sale or exchange was never completed. See Kuehner v. Commissioner, 214 F.2d 437, 441 (1st Cir. 1954). The payments received were to secure taxpayer's agreement to escrow the particular number of shares of Graphic Arts stock to which each executory transaction related. No part of the $95,000 was ever applied in reduction of the notes. Rather, taxpayer brought suit on the notes and no credit on them was given for the $95,000 payments made. Thus, the payments were more in the nature of liquidated damages; as such they were taxable as ordinary income. Mittleman, Smith, Melone, Boatman, and Johnson, supra. There need have been no specific provision for liquidated damages in any of the escrow agreements. Binns v. United States, supra; Melone v. Commissioner, supra; Myers v. Commissioner, 287 F.2d 400 (6th Cir.), cert. denied, 368 U.S. 828, 82 S.Ct. 48, 7 L.Ed.2d 31 (1961). See also United States Freight Co. v. United States, 422 F.2d 887, 893–894 (Ct.Cl.1970) (purchaser afforded ordinary loss treatment for down payment sacrificed when intended purchase of stock not completed and sale or exchange accordingly not resulting).

The Tax Court relied upon Rule 1 of § 100 of the New York Personal Property Law (McKinney's Consol.Laws, c. 41, 1962), one of the pre-Code rules for ascertaining intention as to when "the property in the goods [is to pass] to the buyer." But this provision related to the sale of chattels; stock transfers were governed by § 162 of the Personal Property Law, which required that "[t]itle . . . to the shares . . . can be transferred only" by delivery of the certificates, either endorsed or with accom-

panying assignment or power of attorney.[3] Coyne v. Chatham Phenix National Bank & Trust Co., 155 Misc. 656, 660, 281 N.Y.S. 271, 277 (City Ct. N.Y.1935). Federal tax law is concerned with the "benefits and responsibilities associated with legal ownership." Titcher v. Commissioner, 57 T.C. 315, 323 (1971). Here all such benefits and responsibilities were retained by taxpayer at all times, subject only to escrow of the stock against future payment of notes that were not paid.

True, there may be circumstances where capital gain or loss treatment has been deemed appropriate because in the first instance there was an actual sale or exchange of some underlying asset. Thus in Lowe v. Commissioner, 44 T.C. 363 (1965), relied on by the Tax Court below, the purchasers did acquire by virtue of the initial sale of the stock "the greater bundle of rights and attributes of ownership, including title, possession and management, and the burdens and benefits accompanying same. . . ." 44 T.C. at 369. But this could not be said of anything acquired by Van de Maele and O'Connor from taxpayer. There was no transfer of any asset to them. Nor can it be argued that the settlement agreement of April, 1970, effected a sale or exchange of the Graphic Arts stock, for by that time the corporation was long since defunct; the delivery of the certificates was merely a formality, in the nature of a sop to the buyers who paid a total of $184,500 for stock in a corporation that apparently never transacted any real business and was a desiccated shell before the certificates were ultimately transferred. In short, the settlement of April, 1970, cannot serve retroactively to create a sale or exchange where none occurred in the first instance. See Dobson v. Commissioner, 321 U.S. 231, 232, 64 S.Ct. 495, 88 L.Ed.2d 691 (1944). Indeed, the New York Supreme Court's decision denied taxpayer relief in reference to his claim for $24,000 on the basis that the claim was "not proved by document."

In view of our holding that there was no sale or exchange so that taxpayer was not entitled to treat the gain as a capital one, it is unnecessary to reach the question whether taxpayer was entitled to the benefit of the installment reporting section of the Code, 26 U.S.C. § 453(b)(1)(B). For purposes of this lawsuit the parties agreed that $25,000 was received in 1961, $40,000 was reportable in 1962 and $30,000 was deemed taxable in 1963.

The Tax Court allowed the taxpayer deductions for entertainment expense in connection with the use of his 46-foot off-shore sailing sloop, the Chee Chee V, on which he claimed to entertain clients and potential clients in connection with his law practice.[4] But in

---

**3.** Both §§ 100 and 162 of the Personal Property Law were repealed upon enactment of the Uniform Commercial Code, McKinney's Consol.Laws, c. 38, § 10–102, effective Sept. 27, 1964.

---

**4.** Taxpayer called himself "basically a litigator." His schedules C for each of the taxable years 1963, 1964 and 1965 showed the following:

|  | 1963 | 1964 | 1965 |
|---|---|---|---|
| Gross Receipts | 70,171.92 | 136,504.56 | 310,522.87 |
| Fees Paid to Other Lawyers | 14,759.30 | 48,219.22 | 200,331.93 |
| Promotion and Entertainment Expense | 14,410.99 | 11,416.70 | 18,968.88 |
| Other Business Deductions | 59,931.85 | 74,880.90 | 85,039.30 |
| Net Reportable Income from Law Practice | (18,930.22) | 2,023.74 | 6,182.76 |

The transcript of the hearing below contains this colloquy:

> The Court: In looking at your returns I added them up here for a year and a half, Mr. Handelman, and I must congratulate you as to your

our view the Tax Court failed to apply properly § 274 of the Internal Revenue Code, 26 U.S.C. § 274, which was applicable to the taxable years in question.[5] Section 274, which was adopted to eliminate tax abuses in respect to entertainment expense deductions,[6] is strictly a disallowance provision, the terms of which must be met in addition to other provisions of the Code such as 26 U.S.C. § 162, which would otherwise allow a deduction. *See* Sanford v. Commissioner, 50 T.C. 823, 826 (1968), aff'd, 412 F.2d 201 (2d Cir.) (per curiam), cert. denied, 396 U.S. 841, 90 S.Ct. 104, 24 L.Ed.2d 92 (1969). Section 274(a)(1)(B) denies any deduction unless the taxpayer shows (i) that the facility was "used primarily for the furtherance of the taxpayer's trade or business" and (ii) that the particular expenses were "directly related to the active conduct of such trade or business." Under § 274(d) the taxpayer has the additional responsibility of substantiating the expenses claimed and the business relationship thereof. The Treasury

---

survival. As I stated previously, taking your returns for 1961 through 1965 I come up with an average taxable income of $3,200 a year.

The Witness: Well, your Honor, we're talking about—to simplify it—

The Court: (Interrupting) Let's take 1965; when all of this should bear fruit, it shows that you had a net profit of $6,182 from the practice of law. That's not enough to run the boat on.

---

**5.** Section 274 was added to the Internal Revenue Code of 1954 § 4(a)(1) of the Revenue Act of Oct. 16, 1962, Pub.L.No. 87–834, 76 Stat. 974, and is applicable to taxable years ending after December 31, 1962. It reads as follows:

§ 274.

(a) Entertainment, amusement, or recreation.—

(1) In general.—No deduction otherwise allowable under this chapter shall be allowed for any item—

(A) Activity.—With respect to an activity which is of a type generally considered to constitute *entertainment, amusement, or recreation,* unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or

(B) Facility.—With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility *was used primarily for the furtherance of the taxpayer's trade or business* and that the item was *directly related to the active conduct* of such trade or business, and *such deduction shall in no event exceed the portion of such item directly related to,* or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, *the active conduct of the taxpayer's trade or business.*

· · · ·

(d) Substantiation required.—No deduction shall be allowed—

· · · ·

(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, · ·

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) *the business purpose* of the expense or other item, and (D) *the business relationship* to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.

(Emphasis in all cases added.)

**6.** *See* H.R.Rep.No.1447, 87th Cong., 2d Sess. 19 (1962) (1962–3 Cum.Bull. 423); S.Rep.No. 1881, 87th Cong., 2d Sess. 25 (1962) (1962–3 Cum.Bull. 730–31), U.S.Code Cong. & Admin. News, p. 3297.

Regulations, 26 C.F.R. §§ 1.274–2, 1.274.-5, explaining the disallowance and substantiation provisions of the statute have previously been upheld and applied by this and other courts. *E. g.,* Hippodrome Oldsmobile, Inc. v. United States, 474 F.2d 959 (6th Cir. 1973); D. A. Foster Trenching Co. v. United States, 473 F.2d 1398 (Ct.Cl.1973); Sanford v. Commissioner, *supra.* In our view the taxpayer here did not establish that his facility was used "primarily" for the furtherance of his trade or business, nor did he establish that the expenses were "directly related to the active conduct" of his trade or business, in addition to which he did not sufficiently substantiate the expenses.

■ Regulation § 1.274–2(e)(4)(iii) follows the Congressional committee reports in providing that the "primary use" of a facility is established by "showing that more than 50 per cent of the total calendar days of use of the facility . . . during the taxable year were days of business use." *See* H.R.Rep.No. 1447, 87th Cong., 2d Sess. 22 (1962) (1962–3 Cum.Bull. 426); S.Rep.No.1881, 87th Cong., 2d Sess. 31, 170 (1962–3 Cum.Bull. 736–37), U.S.Code Cong. & Admin.News, p. 3297. Here there was no evidence either as to taxpayer's total use of the sloop or as to the clearly nondeductible personal use of the boat, although there was considerable testimony that he did use the boat for racing purposes (and the publicity that such racing developed for him). The taxpayer took the position that there were only 12 weekends available for use of the boat and that he used it on these weekends to entertain people who subsequently either brought him business or became clients.[7] The statute and regulations clearly require that there be a showing that the facility was "used primarily" for business purposes by a precise accounting of the days and purposes of use. Fiorentino v. Commissioner, 29 T.C.M. 1445 (1970), supp. op., 29 T.C.M. 1665 (1970), aff'd, 455 F.2d 1406 (2d Cir. 1971) (without opinion) (no adequate evidence of business purpose of entertainment or business relationship of persons entertained for days of alleged business use); Andress v. Commissioner, 51 T.C. 863 (1969) aff'd, 423 F.2d 679 (5th Cir. 1970) (per curiam) (club dues and liquor not deductible where no showing of direct relationship to law practice and no showing of days of total use, nondeductible use and business use of facility); Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225 (1971) (boat held not primarily used for business where insufficient showing that days of business use exceeded days of nondeductible days of personal use); Ashby v. Commissioner, 50 T.C. 409 (1968) (no proof that more than 50 per cent of the days of use of boat were business related). Taxpayer did introduce some summaries prepared by his secretary on the basis of underlying telephone logs and diaries, but these did not include an accounting of use taxpayer made of his yacht for personal purposes but only those specific uses arranged through the office; the summaries, moreover, did not in any way indicate the business purpose or business relationship of the persons entertained on each occasion. Treas.Reg. § 1.274–5(c)(6)(iii) and § 1.274–5(b)(3); Fiorentino v. Commissioner, *supra.*[8]

---

7. The transcript contains this testimony of the taxpayer:

> I don't know what kind of boat your Honor is referring to, but certainly there has been more entertainment done on sailboats in recent years. That's what the glamor part is. I submit it may be a sneaky way to practice law. I do think utilizing a little glamor, giving somebody what they think they want—it may be your tie or the curl of your hair—I don't know how one selects a lawyer, but I have been fortunate. I have had a few cases on the books that involve millions of dollars coming directly from that field, and after all, I hit on this idea some years back, and I am now really for the first time cashing in on this program because that's where my analysis was that people in the boating field, just as in the entertainment, manufacturers and so forth, those are the people who spend money. If they spend money they have money, and they make good clients.

8. Since the Tax Court itself recognized this and mentioned it after the documentary evidence had been presented, we fail to see why the court allowed the deduction:

■ Beyond, this, the Tax Court did not consider the requirement of the statute that the particular expenses claimed must themselves be "directly related to the active conduct" of business. *See* § 274(a)(1)(B); Hippodrome Oldsmobile, Inc. v. United States, *supra.* The most that the taxpayer showed was that he used the Chee Chee V as a means of generating good will among persons he hoped would become clients.[9] As *Hippodrome Oldsmobile* held, "as a matter of law . . . deductions claimed by the taxpayer for entertainment of customers" the purpose of which was to establish good will are not directly related to the active conduct of the taxpayer's business. 474 F.2d at 960. *See also* D. A. Foster Trenching Co. v. United States, *supra.* As stated in the House Report, H.R.Rep.No.1447, *supra,* at 20 (1962–3 Cum.Bull. 424), the taxpayer must "show more than a general expectation of deriving some income at some indefinite future time from the making of the entertainment-type expenditure . . . .."[10] One has to conclude from this record that the taxpayer scrupulously avoided any encroachment on the glamorous atmosphere he wished to create so that he did not conduct any business on the boat and in no manner suggested that the Chee Chee V was being used for specific business purposes.[11]

One of the clear purposes of enacting § 274 was to overrule Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), where this court permitted an approximation of expenses actually incurred for otherwise deductible purposes. *See* Hughes v. Commissioner, 451 F.2d 975, 976–78 (2d Cir. 1971); Sanford v. Commissioner, *supra.* Here, however, the Tax Court, purporting to follow LaForge v. Commissioner, 434 F.2d 370 (2d Cir. 1970), held that there was substantiation on the basis of the list compiled from his office records showing the names of guests entertained aboard the yacht, taken together with taxpayer's testimony that some of those individuals became actual paying clients or forwarders of business. The court was satisfied that taxpayer substantiated his right to the deduction of not less than 60 per cent of such costs for the taxable years 1963 to 1965, relying on the fact that that was the deduction agreed upon by the parties for the taxable years 1961 and 1962 (which were, of course, prior to the effective date of § 274). While taxpayer established the overall cost of running his

---

The Court: You may proceed, Mr. Jaffe, but the Court would remind you that for the 274 years we have to have an enumerator and denominator, and there is no way from the information which has been submitted thus far to arrive at any ratio, and the law says it has to be used primarily, and that has been construed to be more than half.

9. "I have used the boat primarily for entertainment and promotion with the idea of creating clients and obtaining legal retainers."

10. While the Senate took a view more generous to the taxpayer, the conference committee report indicates that entertainment expense for the purpose of good will may be allowed only in respect to entertainment activities, not the use of entertainment facilities. H.Conf.Rep.No.2508, 87th Cong., 2d Sess. 15–16 (1962) (1962–3 Cum.Bull. 1144), U.S.Code Cong. & Admin.News, p. 3297; Hippodrome Oldsmobile, Inc. v. United States, 474 F.2d 959 (6th Cir. 1973).

11. Taxpayer seeks to have us carve out an exception to the general rule that entertainment expenditures must relate to specific

business purposes by arguing that lawyers, unlike automobile salesmen, *see Hippodrome Oldsmobile, supra* note 10, or underground construction companies, *see* D. A. Foster Trenching Co. v. United States, 473 F.2d 1398 (Ct.Cl.1973), are prohibited from advertising by the Code of Professional Responsibility. Accordingly, he maintains, he was "trying to sell himself" to wealthy individuals who might require legal services in the future in the only way in which he was permitted. Merely to state this argument is to demonstrate its absurdity. Counsel invites us to grant a tax deduction for expenditures designed not only to circumvent the strictures of the Code of Professional Responsibility, but also to develop business for a lawyer because of his conviviality or sailing ability rather than his legal talents. Nor are we shown any tax principle that enables a lawyer's inability to advertise in some ways to render deductible what would otherwise be nondeductible expenditures. Thus, there is little basis for removing this case from the usual rule that the general expectation of income at some indefinite future time is insufficient to justify an entertainment deduction.

sailboat, he did not establish the time and place of each use of the boat, the business purpose pertaining thereto or the business relationship to the taxpayer of the persons using the boat. His summaries do not in any way help to determine the allocable portion of the total expenses since they are merely composite lists of the persons entertained. In La-Forge v. Commissioner, *supra,* we held that a surgeon who customarily purchased lunch for his assistants at a hospital cafeteria where receipts were not given could fulfill the substantiation requirements by his own statements and other corroborative evidence if both were "sufficiently precise" to satisfy such element of substantiation. 434 F.2d at 372. In Hughes v. Commissioner, 451 F.2d at 979, we said as to *LaForge:*

> The significance of *LaForge* is that, even though a written statement may not be required for substantiation, the corroborative evidence must nevertheless establish each statutory element—amount, time, place and purpose—of the expenditure with precision and particularity. In *LaForge* the cashier's oral testimony properly corroborated those elements of the taxpayer's claimed expenses; thus the evidentiary basis for the deduction was established, and the remand was appropriate to allow the taxpayer to subtract only his non-deductible expenditures. In the case before us, however, not only did the corroborative evidence presented not approach the specificity and precision we believe required by the statute and regulations, but there was *no* corroborative evidence whatsoever relative to the statutory elements of all but a minimal number of the claimed expenditures.

Here, also, the taxpayer has presented *unspecific and imprecise evidence* with no corroboration.

Settlement for the two pre-§ 274 years, of course, has no bearing on the deduction for the years in question.

Judgment reversed; cause remanded to Tax Court for recomputation in accordance with this opinion.