### BERKLEY MACHINE WORKS & FOUNDRY COMPANY, Appellees,

v.

### COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 78–1759.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1979.

Decided June 2, 1980.

Gilbert S. Rothenberg, Tax Div., Dept. of
Justice, Washington, D. C. (M. Carr Fergu-

son, Asst. Atty. Gen., Michael L. Paup and Gilbert E. Andrews, Tax Div., Dept. of Justice, Washington, D. C., on brief), for appellant.

Ellsworth T. Simpson, Washington, D. C., for appellees.

Before RUSSELL and PHILLIPS, Circuit Judges, and ROSZEL C. THOMSEN, Senior United States District Judge, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

The Commissioner of Internal Revenue appeals from a decision of the United States Tax Court, J. Gregory Bruce, Judge, allowing the taxpayer a deduction of some $100,000 for business entertainment expenses incurred in connection with a hunting and fishing facility it maintained on Ocracoke Island, North Carolina. Because we conclude that the claimed expenses, while undoubtedly business-related, do not meet the strict requirements of section 274 of the Internal Revenue Code of 1954 (as amended in 1962), and that taxpayer has not adequately substantiated the expenses as also required under that section, we reverse.

During the years at issue, 1963–67, taxpayer Berkley Machine Works & Foundry Co. (Berkley) operated a foundry, pattern shop and machine shop located in Norfolk, Virginia. It manufactured machine parts used by other companies in their production process. The company has emphasized, with apparent success, its ability to produce component or repair parts quickly and less expensively than its competitors.

Media advertising is of limited usefulness in such a business, and over the years Berkley has depended on personal contacts and maintenance of congenial working relationships with its customers for the promotion of its business. Berkley's business during these years was concentrated in a small number of major customers. Its sales representatives were each responsible for certain customers on a continuous basis and were encouraged to get acquainted with the employees with whom they would deal in trying to fulfill a customer's requirements.

One of the means developed by Berkley's president, Sam Jones, Sr. to develop and maintain good relations with its prime customers was the use of a hunting and fishing lodge owned and maintained by the company on Ocracoke Island, North Carolina. The island is a 20-mile-long strip of land roughly mid-way of North Carolina's Outer Banks, with a small village at one end. "Berkley Manor," the company's facility located there, consists of three buildings, each containing a living room, dining room and bedrooms. The largest building has a room with a drafting board, table and chairs, which could be used as a conference room.

On frequent weekends from early spring to late fall, employees from Berkley's major customers and some of its small ones were invited to Ocracoke for fishing weekends. The testimony indicated that Berkley's officers would decide which customer or customers would be invited for a particular weekend, and the sales representative for that customer would phone a contact of his in a position of authority in that company, who would in turn designate the employees allowed to go. Generally the parties were composed of 15–20 people, frequently from one company but sometimes from two or more different ones. It was not unusual for the wives and children of employees to accompany them (App. 340–41; 344–45). The responsible sales representative would attend, and Sam Jones was usually present during the day, though he spent his nights at his personal residence elsewhere on the island. Most of the trips began on Thursday evening or Friday morning, and lasted through Sunday morning. The guests would spend most of Friday and Saturday fishing on boats chartered by the company, each of which held four to six people.

The testimony uniformly indicated that business discussions always took place on these trips, though not according to any prearranged agenda. Witnesses for the taxpayer, customer employees who had been present on many of the fishing weekends, stated that business was a subject

that came up "anyplace, sometimes on the boat, sometimes in the fishing lodge, sometimes in a room." (App. 157; 234). Another witness indicated that they would "wind up talking shop" when "fishing was poor" and distractions were minimal. (App. 189–90). Sometimes the discussions centered on problems that had arisen in a customer company's production process, and a guest might discuss with a Berkley representative whether certain repair work could be performed or certain parts manufactured. A few witnesses described occasions when they had taken plans or specifications with them to Ocracoke to discuss whether Berkley could make the parts required. But no witness stated that the weekends were scheduled for the purpose of resolving a particular problem; rather, they took advantage of a previously planned fishing weekend at Ocracoke to bring along business problems that had arisen in the interim. (App. 186–87; 315). And Berkley's Vice President, Sam Jones, Jr., could recall no Ocracoke weekend when written contracts were actually negotiated. (App. 264–65). Taxpayer claimed as business entertainment expenses for the years 1963–67 various expenditures made in providing these trips.

## I

■ Ordinary and necessary business expenses of a taxpayer are deductible under § 162 of the Internal Revenue Code.[1] Business entertainment and travel expenses are governed by this provision, but will be disallowed if they fail to satisfy the more rigorous requirements of § 274(a)[2] as well as the substantiation provisions of § 274(d). The Tax Court found that Berkley's Ocracoke-related expenditures were sufficiently business-related to satisfy the requirements of § 162, and the record clearly supports that conclusion. The Government does not challenge this finding, or the ruling that the Ocracoke lodge was used "primarily for the furtherance of the taxpayer's trade or business," as required by § 274(a)(1)(B). That provision simply refines the principles of § 162, and may be satisfied if the taxpayer establishes that more than 50 percent of the total calendar days of use of the facility were devoted to business use as defined by § 162, rather than to personal use. Treas. Reg. § 1.274–2(e)(4) (1969); *D. A. Foster Trenching Co. v. United States,* 473 F.2d 1398, 1400–01, 200 Ct.Cl. 526 (1973).

The central issue on this appeal is whether the character of the business activity at Ocracoke was such that the entertainment deductions claimed with respect to it can be said to have been "*directly* related to the *active* conduct" of Berkley's business, as further required by § 274(a)(1)(B) (emphasis supplied). Additionally, even if that provision is satisfied, taxpayer must have produced adequate substantiation for each item deducted, or the entire deduction must be disallowed under § 274(d). The Tax Court concluded that the deductions were

---

1. All Code references are to the Internal Revenue Code of 1954, as amended.

2. Sec. 274(a) provides in pertinent part:
§ 1.274 Statutory provisions; disallowance of certain entertainment, etc., expenses.
SEC. 274. Disallowance of certain entertainment, etc., expenses—(a) Entertainment, amusement, or recreation—(1) In general. No deduction otherwise allowable under this chapter shall be allowed for any item—
(A) Activity. With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was

associated with, the active conduct of the taxpayer's trade or business, or
(B) Facility. With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deductions shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.

allowable under these provisions, but we disagree.

## II

Proper application of § 274 requires a consideration of the legislative history accompanying its passage. Support for this section, added to the Code by the Revenue Act of 1962, was generated by a concern that the broad interpretation given the "ordinary and necessary" language of § 162, together with the rule of *Cohan v. Commissioner*[3] allowing deduction of an approximation of travel and entertainment expenses, had led to widespread abuse of the deduction provision. The substantiation requirements of § 274(d) were intended to abolish the *Cohan* rule and require the taxpayer to prove the exact amount and circumstances of the deduction; otherwise it would be disallowed entirely.[4]

Another evident purpose of section 274 was to limit the types of business entertainment expenditures otherwise deductible under § 162 by requiring them to meet a more stringent standard of business-relatedness than had theretofore obtained. This purpose is clear in the House Ways and Means Committee Report:

> With respect to expenses for entertainment activities, the bill provides that a deduction will be allowed only to the extent that the taxpayer establishes that the expense was directly related to the active conduct of his trade or business. This means that the taxpayer must show a greater degree of proximate relation between the expenditure and his trade or business than is required under present law. Among other things he will have to show more than a general expectation of deriving some income at some indefinite future time from the making of the entertainment-type expenditure . . . .[5]

This language reveals a clear intent by the House Committee to eliminate deductions for the expense of business entertainment aimed at generating "good will" among present or prospective customers, without necessarily involving any concrete business discussions. *Hippodrome Oldsmobile, Inc. v. United States*, 474 F.2d 959 (6th Cir. 1973). The Senate Finance Committee, however, felt the House bill was too harsh on taxpayers and advocated an amendment "to permit the deduction of expenses for goodwill where a close association is established between the expense and the active conduct of a trade or business." It proposed to add the language "or associated with" to the "directly related to the active conduct of the taxpayer's trade or business" requirement in both subsections (A) and (B) of section 274(a)(1). The Senate Report stated: "This new language will permit deduction of expenses for entertainment, amusement, or recreation incurred for the creation or maintenance of business goodwill without regard to whether a particular exception applies."[6]

The Joint Conference Committee Report reveals that a compromise was reached whereby the Senate Committee won on one issue with respect to § 274(a) and lost on the other. The Conference Committee added the Senate language to § 274(a)(1)(A) of the Act, disallowing deductions with respect to an entertainment activity "unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with" the active conduct of the taxpayer's trade or business.[7] But the House Committee

---

3. 39 F.2d 540 (2d Cir. 1930). The court there held that a taxpayer who had incurred deductible travel or entertainment expenses but *could not* prove their exact amount was entitled to a deduction of an approximation of the amount.

4. H. R. Rep. No. 1477, 87th Cong., 2d Sess. 19 (1962–3 Cum.Bull. 405, 427).

5. *Id.* at 18; 1962–3 Cum.Bull. at 424.

6. S. Rep. No. 1881, 87th Cong., 2d Sess. 26, 27, U.S.Code Cong. & Admin.News 1962, pp. 3297, 3328 (1962–3 Cum.Bull. 707, 731–32).

7. H. Conf. Rep. No. 2508, 87th Cong., 2d Sess. 16 (1962–3 Cum.Bull. 1129, 1143).

language prevailed without addition of the "associated with" qualifying language in § 274(a)(1)(B), concerning general entertainment expenses in connection with facilities, which is the section applicable to this appeal.

Treasury Regulations adopted pursuant to authority granted in § 274(h) provide more insight into the meaning of the "directly related" requirement. Section 1.274–2(c)(3) provides:

(3) *Directly related in general.* Except as provided in subparagraph (7) of this paragraph, an expenditure for entertainment shall be considered directly related to the active conduct of the taxpayer's trade or business if it is established that it meets all of the requirements of subdivisions (i), (ii), (iii) and (iv) of this subparagraph.

(i) At the time the taxpayer made the entertainment expenditure (or committed himself to make the expenditure), the taxpayer had more than a general expectation of deriving some income or other specific trade or business benefit (other than the goodwill of the person or persons entertained) at some indefinite future time from the making of the expenditure. A taxpayer, however, shall not be required to show that income or other business benefit actually resulted from each and every expenditure for which a deduction is claimed.

(ii) During the entertainment period to which the expenditure related, the taxpayer actively engaged in a business meeting, negotiation, discussion, or other bona fide business transaction, other than entertainment, for the purpose of obtaining such income or other specific trade or business benefit (or at the time the taxpayer made the expenditure or committed himself to the expenditure, it was reasonable for the taxpayer to expect that he would have done so, although such was not the case solely for reasons beyond the taxpayer's control).

(iii) In light of all the facts and circumstances of the case, the principal character or aspect of the combined business and entertainment to which the expenditure related was the active conduct of the taxpayer's trade or business (or at the time the taxpayer made the expenditure or committed himself to the expenditure, it was reasonable for the taxpayer to expect that the active conduct of trade or business would have been the principal character or aspect of the entertainment, although such was not the case solely for reasons beyond the taxpayer's control). It is not necessary that more time be devoted to business than to entertainment to meet this requirement. *The active conduct of trade or business is considered not to be the principal character or aspect of combined business and entertainment activity on hunting or fishing trips or on yachts and other pleasure boats unless the taxpayer clearly establishes to the contrary.*

(iv) The expenditure was allocable to the taxpayer and a person or persons with whom the taxpayer engaged in the active conduct of trade or business during the entertainment or with whom the taxpayer establishes he would have engaged in such active conduct of trade or business if it were not for circumstances beyond the taxpayer's control. For expenditures closely connected with directly related entertainment, see paragraph (d)(4) of this section.

26 C.F.R. § 1.274–2(c)(3) (emphasis supplied).

### III

■ We think it clear that the discussions that took place during the Ocracoke weekends, while certainly business-related and undoubtedly of general economic benefit to Berkley, were not properly established on the evidence as *directly* related to the *active* conduct of its business as contemplated by the statutory language and history and by the Regulations. Witnesses indicated that the trips were valuable to both sides because they provided an opportunity for the development of personal relationships between employees of customer companies and their contacts at Berkley. This tended to smooth the way for a quick reso-

lution of problems that would arise in the course of the companies' business dealings. The practice of mixing employees from different companies on one trip allowed them to compare notes on things that Berkley was doing for their respective companies and may have, somewhere down the road, generated more income for Berkley. Similarly, it may have saved the company money when customers took advantage of their scheduled fishing weekend to bring up problems that had recently surfaced in production schedules or machine operation. None of this evidence, however, indicates that Berkley had, at the time it arranged or took part in the Ocracoke weekends, *more* than a "general expectation of deriving some income or other specific trade or business benefit," other than goodwill, at some indefinite future time.

Two customers did testify that they had on one or more occasions brought plans or specifications along for the purpose of going over specific projects with Berkley representatives. Though this type of activity may constitute a negotiation or discussion for the purpose of obtaining a "specific trade or business benefit" under subparagraph (3)(ii), these discussions were not adequately substantiated under § 274(d), as we discuss below. Because these few specific discussions recalled by customers were inadequately substantiated, and the discussions described in the bulk of the trial testimony were informal and general in nature, of the sort that inevitably arise when people whose common bond is business are together, the taxpayer has failed to overcome the presumption stated in subparagraph (3)(iii), that the active conduct of trade or business is considered *not* to be the principal character of combined business and entertainment activity on hunting or fishing trips, unless the taxpayer *clearly establishes to the contrary.* We think that Berkley's evidence, consisting of undocumented recollections by witnesses whose memories were clouded by the passage of time so that most could not positively recall even the *year* when these discussions took place, cannot be considered to establish clearly that the active conduct of business took place on all these occasions.

At most it reveals that the benefits derived by Berkley from these weekends were in the area of general business goodwill, exactly the type of expenditure that Congress intended to eliminate as a deduction by means of the directly related test.

Other courts have held that business entertainment primarily directed toward generating goodwill cannot, as a matter of law, be "directly related to the active conduct" of the taxpayer's business. *Handelman v. Commissioner,* 509 F.2d 1067, 1074 (2d Cir. 1975); *Hippodrome Oldsmobile, Inc. v. United States,* 474 F.2d 959, 960 (6th Cir. 1973); *St. Petersburg Bank & Trust Co. v. United States,* 362 F.Supp. 674 (M.D. Fla. 1973), *aff'd,* 503 F.2d 1402 (5th Cir. 1974). In *Hippodrome,* an automobile agency deducted the expenses of a pleasure boat used for entertaining past and prospective customers. The Sixth Circuit reversed the district court's holding that these expenses met the requirements of sections 162 and 274 of the Code, and held that these were goodwill expenditures clearly disallowed by the directly related test. 474 F.2d at 960. The *Handelman* court also reversed the Tax Court's allowance of deductions by an attorney of expenses connected with entertainment of clients, past and future, on his yacht, for promotional purposes. The Tax Court in the instant case held these cases inapposite because of factual distinctions, particularly that the taxpayers in both cases generally would not initiate business discussions on the boat trips. Though we recognize the differences between the type of entertainment and the atmosphere in these cases and that provided by Berkley, we do not think they are so significant as to remove the Ocracoke weekends from the same category of goodwill entertainment. Probably the Berkley representatives did at times initiate business discussions (though the testimony concerning such discussions as did take place indicates that they were initiated by the customer) but we do not think that this point is dispositive. The *Hippodrome* court noted that fact only in ruling on the narrow point that the taxpayer had not met the requirement of 26 C.F.R.

§ 1.274–2(c)(3)(ii), by showing that it had actively engaged in bona fide business transactions during the excursions. 474 F.2d at 965. Nor was this point crucial to the *Handelman* holding that the taxpayer had not shown more than a general expectation of deriving income at some indefinite future time from his entertainment expenditures. 509 F.2d at 1074. The Treasury Regulations in this area clearly intend that all the facts and circumstances of each case must be considered in determining the character of the business conduct. Though the business discussions at Ocracoke, among businessmen with an ongoing relationship, may have been more concrete than those indicated by the facts in *Hippodrome* and *Handelman*, there are other considerations, such as the larger number of people, some of whom were not business associates, and the variety of pleasurable distractions, that point to the essentially indirect relationship between these outings and the *active* conduct of taxpayer's business. These factors were significant in the *St. Petersburg Bank* case, in which the bank had a practice of inviting present or potential customers to dove shoots and barbecues, during which bank employees would circulate among the guests and tout the services of the bank, sometimes discussing specific transactions. 362 F.Supp. at 675. The court nevertheless found that the benefits to the bank were of the goodwill variety and the entertainment did not pass the "directly related" test. *Id.* at 680.[8]

## IV

Having determined that the entertainment expenditures related to the operating costs of the Ocracoke facility are not "directly related" expenditures within the meaning of § 274(a)(1)(B), it is appropriate to consider whether certain categories of the Ocracoke expenditures are nevertheless allowable under § 274(a)(1)(A), relating to activities.

Section 1.274–2(e)(3)(iii)(a) of the Regulations provides that certain "out of pocket" expenditures, such as those for food and beverages, are not to be considered as expenditures with respect to a facility, under subsection (B). But the question arises whether these expenses may be allowed as deductions under the more lenient "associated with" test of subsection (A), which as the legislative history reveals, was intended to include goodwill entertainment. This test is expressly qualified, however, by the language that the expense must relate to "an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise) . . . ." The Conference Committee Report that discussed the addition of this language notes as examples of expenses that qualify under this section, the entertainment of a group of business associates at a restaurant, theater or sporting event following substantial negotiations, or the entertainment of out-of-town business associates on the evening

---

**8.** None of the other subparagraphs of the Regulation section defining "directly related" entertainment is helpful to this taxpayer. The Ocracoke expenditures were not made in a "clear business setting" within the meaning of § 1.274–2(c)(4); this provision applies to entertainment that is clearly subordinate to a business purpose, such as the operation of a hospitality room at a convention. Subparagraph (7) supports this conclusion by providing that certain expenditures are generally considered not directly related, including those where "[t]he distractions were substantial, such as . . . (b) A meeting or discussion, if the taxpayer meets with a group which includes persons other than business associates, at places such as cocktail lounges, country clubs, golf and athletic clubs, or at vacation resorts." This provision tracks the Conference Committee Re-

port, which noted that the rule of the House bill, which prevailed in this section, "would not allow deduction of expenditures for entertainment occurring under circumstances where there is little or no possibility of conducting business affairs or carrying on negotiations or discussions relating thereto, such as where the group of persons entertained is large or the distractions substantial." H. Conf. Rep. No. 2508, 87th Cong., 2d Sess. 16 (1962–3 Cum. Bull. 1129, 1143). Clearly the Ocracoke weekends, involving fairly large group of people, some of whom were not business associates, and taking place in a setting where the distractions for sportsmen were substantial, were not the "clear business setting" envisioned by Congress. *See D. A. Foster Trenching Co. v. United States*, 473 F.2d 1398, 1402–04, 200 Ct.Cl. 526 (1973).

before such "substantial business discussions." H. Conf. Rep. No. 2508, 87th Cong., 2d Sess. 17.

The Ocracoke weekends clearly do not come within the statute's contemplation of entertainment that takes place purely as an adjunct to formal business meetings. Nor do we consider that expenses may qualify under the test when the claimed business discussions take place during the course of a combined social/business function. *See St. Petersburg Bank & Trust Co. v. United States*, 362 F.Supp. 674, 681 (M.D. Fla. 1973). Thus Berkley's Ocracoke-related expenditures must be considered disallowed under both subsections (A) and (B) of § 274(a)(1).

## V

■ Having concluded that Berkley's contested entertainment deductions must be disallowed under § 274(a), it may not be strictly necessary to consider separately the Government's argument that the deductions must be disallowed for lack of adequate substantiation under § 274(d). But because we should correct the misapprehension of the Tax Court concerning these substantiation requirements, and because a few of Berkley's witnesses testified to business discussions that might have passed the directly related test had they been adequately substantiated, we also address this point.

Section 274(d) of the Code disallows business entertainment expenses altogether "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense . . . , (B) the time and place of the . . . entertainment . . . , (C) the business purpose of the expense . . . , and (D) the business relationship to the taxpayer of persons entertained . . . ." The Treasury Regulations relating to this section state that "adequate records" are an account book, diary, statement of expense or similar record . . . and documentary evidence . . . which, in combination, are sufficient to establish each element of an expenditure . . . ." § 1.274-5(c)(2). Al-

ternatively, if the taxpayer fails to meet the adequate records requirement, he must establish each element "[b]y his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element." § 1.274-5(c)(3). These Regulations have been held lawful and obedient to the legislative intent of § 274, and applied in *Dowell v. United States*, 522 F.2d 708, 713 (5th Cir. 1975); *Nicholls, North, Buse Co. v. Commissioner*, 56 T.C. 1225, 1234 (1971); *Sanford v. Commissioner*, 50 T.C. 823, 830–32 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969).

■ The statute and the Regulations place a heavy burden on the taxpayer, to substantiate *each* element of *every* deducted item of entertainment expense. *Dowell*, 522 F.2d at 714; *BJR Corp. v. Commissioner*, 67 T.C. 111, 128 (1976); *Fiorentino v. Commissioner*, PH Memo T.C., par. 70,316, p. 1583 (1970). This burden was thought to be justified, however, by the abuses of the business entertainment deduction known to be practiced under the old loose standards of 162 and the *Cohan* rule. The requirement of substantiation allows the Government to double-check the amount and the true business character of the deduction, instead of being forced to rely on the taxpayer's "own unsupported, selfserving testimony." (S. Rep. No. 1881, 87th Cong., 2d Sess. 37).

Berkley presented what the Tax Court found were adequate records of the place, time, and amount of the contested expenditures, and the Government does not challenge the court's findings as to these elements. It does contest Berkley's substantiation of the business purpose of the trips and the business relationship of the guests. The company kept no written diary of the Ocracoke trips describing the business purpose for each, and so had to rely on the testimony of some of its guests to corroborate its own statement that the trips had a business purpose. The taxpayer's own statement, as contained in the testimony of its officers, does not provide the "specific

information in detail" required by the Regulations; moreover, the corroborative testimony consisted of testimony by only nine of some 1,000 guests during the relevant years, their testimony related to only 12 of 76 trips, and they could not relate specific business discussions to specific trips. The Tax Court considered this testimony sufficient to establish business purpose in light of the absence of any evidence of personal, non-business use of the facility. But we are of the opinion that this sort of general, often conjectural testimony as to business purpose is exactly the sort of unreliable recollection that the substantiation requirements of § 274(d) were designed to foreclose. *See Rutz v. Commissioner*, 66 T.C. 879, 883–84 (1976); *Nicholls, North, Buse Co. v. Commissioner*, 56 T.C. 1225, 1235 (1971). The Regulations do allow the corroborative evidence of business purpose to be circumstantial in nature, § 1.274–5(c)(3)(ii); but we do not think that evidence of the nature of the Ocracoke trips in general will support a conclusion that each trip had a business purpose. *Cf. Dowell v. United States*, 522 F.2d at 714.

We also conclude that the Tax Court erred in holding that Berkley had adequately substantiated the business relationship of each entertainee at Ocracoke. As the court found, though the taxpayer's witnesses recalled the names of some individual guests, its records contain only a notation of the *company* whose employees were invited down on a particular weekend. To permit the business relationship element to be established by this kind of evidence, when guests who had no business relationship with Berkley admittedly attended in response to the corporate invitation, would frustrate the purpose of this element of substantiation, intended to prevent deductions for "business-related" entertainment of persons actually having no business relation to the taxpayer. The Tax Court is not incorrect in its conclusion that "it is the substance of the relationship and not the particular form of record-keeping that substantiates business relationship"; but the required "substance" must be clear from the records if a taxpayer is to get the

deduction. A business relationship must be established by identification of each person involved in the entertainment deduction, 26 C.F.R. § 1.274–5(b)(1)(iv); if the relationship is, as was the case in *Rutz v. Commissioner*, 66 T.C. 879 (1976), not clear from the name, then the job title should be noted as well. Contrary to the Tax Court's reading, we find *Dowell v. United States* in support of this interpretation. Though Dowell's records were inadequate in areas other than the business relationship element, the court's view of the business relationship element was clearly stated: "the business relationship cannot be ascertained unless the taxpayer establishes the identity of his entertainee—whether by name, title or other specific designation," 522 F.2d at 716. Though on first reading *Nicholls, North, Buse Co. v. Commissioner*, 56 T.C. 1225 (1971) seems to indicate that a record of the employer companies would be sufficient to establish business relationship, a closer reading reveals that this was not the ruling of the court. The taxpayer there kept a log in which he wrote the names of the individuals entertained on his boat, sometimes noting the name of their employer as well. *Id.* at 1232. The court simply noted that business relationship arguably might have been proved if the employers of all the guests had been listed in the log. *Id.* at 1235. Thus it was the employer's name in addition to, not instead of, the individual's name, that would have substantiated their business relationship. Certainly a notation of the employer of the individuals entertained by a taxpayer is helpful in establishing the business relationship of the entertainee; but it is not sufficient without some further identification of the individuals themselves. We conclude that Berkley failed to substantiate adequately the business purpose of the Ocracoke trips and the business relationship of its guests; thus the Ocracoke-related deductions must be disallowed under § 274(d) as well as under § 274(a).

## VI

One final issue remains for resolution. Included in the total depreciation de-

duction claimed by Berkley for 1967 is $1,441.46 for an airplane purchased in that year for $86,487.90. The Commissioner disallowed this deduction, as well as an investment credit of $6,054.14 claimed with respect to the airplane, based on his assumption that the airplane was purchased for use in connection with taxpayer's Ocracoke entertainment activities. The Tax Court, having found the Ocracoke activities directly related to the active conduct of taxpayer's business, allowed the deduction. Other than the testimony of Berkley's accountant that the plane was kept at Norfolk, Virginia and was listed with the Ocracoke assets on Berkley's tax return because there happened to be room for it on that page, there is no evidence in the record as to how the airplane was used. We think the airplane cannot qualify for the investment credit or depreciation deductions because the taxpayer has made no showing that the plane was used in its trade or business or held for the production of income. Internal Revenue Code, §§ 167, 38.

REVERSED.

DONALD RUSSELL, Circuit Judge, dissenting:

I dissent for the reasons assigned by the Tax Court, which I think correctly construed the law and the facts herein.