945 F.2d 404
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ESTATE of Alice B. HOLLO, Deceased; Steve J. Hollo, Sr.,
Executor; and Steve J. Hollo, Sr., Petitioner-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 91-1267.
 United States Court of Appeals, Sixth Circuit.
 Sept. 27, 1991.
 
 Before RALPH B. GUY JR. and BOGGS, Circuit Judges, and HARVEY, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Petitioners appeal from a decision of the United States Tax Court determining their liability for income tax deficiencies for the years 1977 through 1983. The tax deficiencies in question resulted from the disallowance of depreciation claimed on a funeral home owned by the petitioners and from their alleged failure to timely pay a capital gains tax after selling a piece of property for residential development.
 
 
 2
 Upon a review of the record, we conclude that this matter was correctly resolved by the Tax Court, and we affirm on the basis of the written opinion issued by the court. We write briefly only for additional clarification.
 
 
 3
 A. The Purchase and Sale of the Residential Property
 
 
 4
 Petitioner Steve Hollo worked successfully both in the window cleaning business and as a painting contractor. Over the years, he and his wife, Alice, also dabbled in real estate and were generally successful in this venture.
 
 
 5
 In 1969, the Hollos purchased for $53,300 a vacant parcel of land in Strongsville, Ohio, which was suitable for residential development. In 1977, they sold the land for $120,000 to Bailey-Hollo Development Company, a corporation formed by Steve Hollo and William Bailey. It was Bailey-Hollo's intention to subdivide and sell the property for residential building sites. At the time of the sale, the petitioners received no cash but did receive a note for $120,000 bearing five percent interest secured by a first mortgage. The $120,000 purchase price was to be paid within 36 months. Although it was anticipated that a $3,000 principal payment would be made each time a lot was sold, the note contained no mandatory interim payment schedule.
 
 
 6
 The property was subdivided into 40 lots, and the first 10 lots were sold in 1978 for $156,000. No principal payments were made until 1979, however. Bailey-Hollo did not pay off the note in 1980 as required by its terms but ultimately did pay the note in full in 1984. Petitioners reported the entire capital gain on the sale in their 1984 tax return.
 
 B. The Depreciation on the Funeral Home
 
 7
 In 1976, petitioners purchased a parcel of vacant property for $100,000 with the proceeds from a recent sale of a motel. Petitioner's son, Steve Jr., graduated from mortuary school in 1977, and petitioners decided to use the land for the construction of a funeral home to be operated by their son. Steve Hollo discussed the economic feasibility of this project with his accountants and learned that it would feasible, if it could generate a monthly rental of $4,000 to $5,000. Although Hollo had a lease drawn up along these lines, he and his son never executed it. It was orally agreed that Steve Jr. would pay a monthly rental of $5,000. Steve Jr. went into business when the funeral home was completed in late 1977, but he never paid any rent over the next nine years. He did pay taxes, insurance, utilities, and such maintenance costs as were incurred. Since Steve Jr. also lived on the property, his presence there also provided security.
 
 
 8
 The funeral home venture was unsuccessful, and in 1982 petitioners started looking for a buyer for the property. In 1984, petitioners rejected an offer of $750,000. Finally, in 1987, petitioners entered into a five-year lease that contained an option to purchase the property for $750,000. The monthly lease payments varied but totalled $195,000 over the five-year lease period.
 
 
 9
 As owners of the funeral home, petitioners claimed depreciation allowances for the years 1977 through 1983. The Internal Revenue Service ultimately disallowed these deductions. The IRS also claimed that the capital gains tax on the property sold for residential development should have been paid in 1977, the year of sale. Petitioners disagreed, and this litigation followed.
 
 II.
 A. The Capital Gains Tax
 
 10
 Simply stated, the petitioners claim that the note received from Bailey-Hollo did not have an ascertainable fair market value and, accordingly, they were not obligated to report any income with respect to this note in the year of its receipt. In support of this contention, petitioners point to the fact that Bailey-Hollo was little more than a shell corporation with, at least in the beginning, a negative net worth. The Tax Court rejected this argument, and we think properly so.
 
 
 11
 First, there was a mortgage secured by the property, which unquestionably had value, as evidenced by first-year sales of 10 of the 40 lots for $156,000. Second, the petitioners offered no testimony to refute the fact that placing a fair market value of $120,000 on the property in 1977 was realistic. Finally, the petitioners made no effort to sell or discount the note, so that their claim that the note had no value is rank speculation. We find no error in the Tax Court's treatment of this issue.[1]
 
 B. The Disallowed Depreciation
 
 12
 Pursuant to section 167(a) of the Internal Revenue Code of 1954 (Code), 26 U.S.C. § 167(a), a taxpayer may take a deduction for depreciation on property "used in [a] trade or business" or "held for the production of income." Importantly, however, the Code does not allow a depreciation deduction to be taken on property used in a trade or business or held for the production of income unless the taxpayer also establishes that the activity is "for profit." 26 U.S.C. § 183(a). See also Berkley Mach. Works & Foundry Co. v. Commissioner, 623 F.2d 898, 908 (4th Cir.), cert. denied, 449 U.S. 919 (1980). This is where the petitioners foundered. The Tax Court determined that the Hollos were not engaged in the leasing of the funeral home for profit. We must sustain this factual finding unless it is clearly erroneous. Patterson v. Commissioner, 810 F.2d 562, 570 (6th Cir.1987).
 
 
 13
 We have little doubt that when the Hollos purchased the property on which the funeral home was built they hoped to make money on their investment. However, it is equally clear that early on there came a point when helping their son get started in business assumed greater importance than receiving a financial return. Although this type of familial devotion is to be lauded, the interstices of the Internal Revenue Code are not filled with the milk of human kindness. Since persons engaged in business have to pay taxes on their profits, it is only fair that they can deduct their expenses, including depreciation. But it is a two-way street. A taxpayer cannot continue to deduct expenses (especially when those expenses serve as an offset against other earned income) after the decision is made, consciously or otherwise, to preclude the possibility of making a profit from the business. If only one or two years were involved here, this would be a close case. When nine years are involved, it is no longer close, particularly when Mr. Hollo knew at the outset that he needed a cash flow from rent of $4,000 to $5,000 per month but never collected so much as one-month's rent or made any effort to secure a paying tenant.
 
 
 14
 This, of course, is not a case involving any intentional wrongdoing. Between Mrs. Hollo's desire to help her son get started and the son's sincere but unsuccessful efforts to make a go of the funeral business, Mr. Hollo found himself between the proverbial rock and a hard place. Our sympathies are with the petitioners, but the law dictates that our decision be in favor of the Commissioner.
 
 
 15
 AFFIRMED.
 
 
 
 *
 Honorable James Harvey, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 There were other ways this transaction might have been structured for tax purposes, e.g., as an installment sale, but any arguments relating to these alternative possibilities were not timely made