**DANVILLE PLYWOOD CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 554–86T.

United States Claims Court.

March 31, 1989.

John C. Donovan, Atty. of Record, for plaintiff. Merrell & Callahan, McLean, Va., of counsel.

Kenneth C. Gobetz, with whom was Acting Asst. Atty. Gen. James I.K. Knapp, Washington, D.C., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

## INTRODUCTION

Danville Plywood Corporation (hereinafter taxpayer, plaintiff, or Danville) filed the instant suit on September 2, 1986, seeking refund of $45,217.01 in paid corporate income taxes and interest levied by the Commissioner of Internal Revenue (Commissioner), against its fiscal years 1980 and 1981 tax returns. Subject additional tax assessments resulted from the Commissioner's disallowance of certain entertainment expenses claimed per returns by Danville (as advertising expenses) in connection with an alleged "Super Bowl Sales Seminar" [1] (seminar). That so-called seminar was conducted for a select group of its customers to commence on or about Friday, January 23, through Monday, January 26, 1981, in New Orleans, Louisiana. Plaintiff alleges that such expenses were properly deductible per return in that they are *directly related to* or *associated with* the active conduct of its business as contemplated by § 274(a) of the 1954 Internal Revenue Code (Code); [2] and further, that such incurred expenses were ordinary and necessary for the conduct of its business as contemplated by § 162 of said Code.

---

1. The phrase "Super Bowl Sales Seminar" is used only for convenience of *description.* Its use is not intended to concede the ultimate fact as to the true nature of subject trip to New Orleans.

2. Section 274 of the Code provides in relevant parts:

(a) Entertainment, amusement, or recreation.—

(1) In general.—No deduction otherwise allowable under this chapter shall be allowed for any item—

(A) Activity.—With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business....

(d) Substantiation required.—No deduction shall be allowed—

(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or

(3) for any expense for gifts,

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.

(e) Specific exceptions to application of subsection (a).—Subsection (a) shall not apply to—

(1) Business meals.—Expenses for food and beverages furnished to any individual under circumstances which (taking into account the surroundings in which furnished, the taxpayer's trade, business, or income-producing activity and the relationship to such trade, business, or activity of the persons to whom the food and beverages are furnished) are of a type generally considered to be conducive to a business discussion.

Jurisdiction is premised under § 7422(a) of the 1954 Internal Revenue Code, as well as the Tucker Act, 28 U.S.C. § 1491.

Because we find that plaintiff, at a trial on the merits, has failed to carry its burden with respect to the strict requirements contained in §§ 274(a) and (d) (as well as § 162), we are constrained to enter judgment for the defendant.

## FACTS

The court finds the following operative facts, *infra*, which were adduced during a two-day trial on July 11 and 12, 1988.

### A. *Background*

Danville Plywood Corporation, a closely held corporation,[3] was organized in 1975 under the laws of the Commonwealth of Virginia and was one of four brother-sister corporations [4] owned exclusively by George and Sarah Buchanan, Bob and Mary Jordan, and Martha Chukinas. Deft's Ex. 8, para. 13.[5] In addition to his stockholder position, George Buchanan served as president of Danville. Tr. 12. Corporate books of account, as well as tax returns, were kept and filed on an accrual basis with a fiscal year ending November 30. Jt. Ex. 1, p. 2.

During subject taxable years, *i.e.*, 1980 and 1981, Danville engaged in the manufacture of various types of custom veneer plywood for use in kitchen cabinets, store fixtures, furniture, wall panels, wall plaques, and other custom items. Jt. Ex. 1, p. 2. Typically, Danville sold its products to wholesale distributors who, in turn, sold such merchandise to architects, mill work houses, and cabinet shops. Tr. 13. Each order was filled according to customer specifications. In short, Danville did not maintain a finished goods inventory of manufactured panels (Tr. 13). Moreover, it did not generally advertise in trade journals or magazines (Tr. 14, 160–61), or enter into long-term sales agreements with its customers. Tr. 189–90. As a consequence, and due to the variable cost considerations, Danville's plywood prices often varied from one month to the next. Tr. 122.

In moving its products, Danville's marketing strategy consisted of personal calls to the prospective customer's place of business, coupled with follow-up phone solicitation. Tr. 14, 163–64. Apparently, the salesmen made personal visits to customers, and once the contact was established, they generally negotiated future sales telephonically. Tr. 14, 163. Face-to-face sales visits were also conducted on an "as needed" basis. Tr. 164. The cost of said personal visits (*i.e.*, travel) never reached or exceeded $48,217.00 in any given year. Tr. 130–31. Beginning in April 1980, in addition to marketing Danville products, Danville salesmen also marketed the products of Multi Ply Corporation. Tr. 132–33.

Multi Ply, one of Danville's sister corporations, *see supra*, note 4, was incorporated in the early 1960s, and primarily engaged in the manufacture of cut-to-size plywood.[6] Tr. 272, 281. In the late 1960s, the aforementioned Danville shareholders (*i.e.*, the Buchanans, the Jordans, and Ms. Chukinas), purchased approximately 50% of the stock of Multi Ply. The remaining shares were owned by George Buchanan's father-in-law. Tr. 281. Subsequently, in April

---

**3.** A closely held corporation is generally one with: (a) a small number of stockholders; (b) no ready market for its corporate stock; and (c) a substantial majority of its stockholders participating in the management, direction, and operations of the corporation. *See Morowitz v. United States*, 15 Cl.Ct. 621, 624 n. 4 (1988).

**4.** Brother-sister corporations are two or more corporations owned and effectively controlled by one or more individuals. *See Morowitz*, 15 Cl.Ct. at 625 n. 8, and citations therein. Danville enjoyed a brother-sister corporate relationship with the following entities: (1) Southern Building Materials Corporation; (2) Virginia Carolina Veneer Corporation; and (3) Multi Ply Corporation. Deft's Ex. 8, p. 3.

**5.** Each stockholder held the following percentage of stock in Danville:

| | |
|---|---|
| George and Sarah Buchanan | 50% |
| Bob and Mary Jordan | 25% |
| Martha Chukinas | 25% |

**6.** The resulting ownership interest per shareholder in Multi Ply after the April 1980 purchase was as follows:

| | |
|---|---|
| George and Sarah Buchanan | 33% |
| Bob and Mary Jordan | 33% |
| Martha Chukinas | 33% |

1980, said Danville shareholders purchased from George Buchanan's father-in-law all of the remaining Multi Ply shares. Tr. 281.[7]

Mindful of the foregoing background information, the court will now find the facts relevant to the dispute currently before us. Said dispute stems from entertainment expenses, euphemistically styled advertising expenses, incurred during the fiscal years 1980 and 1981, to sponsor the alleged "Super Bowl Sales Seminar."

## B. *The Super Bowl Sales Seminar*

The Commissioner disallowed entertainment expenses incurred by plaintiff in connection with an event held on January 23 through 26, 1981, in New Orleans, Louisiana. The highlight of said event (and the alleged inducement for attendance) was the Super Bowl, in addition to air fare and ground transportation, food, and accommodations. The foregoing was paid for by plaintiff for 120 attendees and, accordingly, was hospitably styled the Super Bowl Sales Seminar. For purposes of our analysis, *infra*, we classify the attendees as follows:

| Characterization | Number [*] | [**] |
|---|---|---|
| (i) Danville's customers' representatives | 58 | 55 |
| (ii) Employees of Danville | 6 | 6 |
| (iii) Customers of customers of Danville | 3 | 3 |
| (iv) Spouses of customers of Danville | 38 | 37 |
| (v) Spouses of employees of Danville | 5 | 5 |
| (vi) Children of Danville's president | 3 | 3 |
| (vii) Children of Danville's customers | 2 | 2 |
| (viii) Friends of Danville's president | 4 | 4 |
| (ix) A shareholder of Danville stock | 1 | 1 |
| Total attendees | 120 | 116 |

[*] Deft's Ex. 2, pp. 4–7.
[**] Jt Ex. 1. The parties agree that four (three customer representatives and one spouse) did not make the trip. Plaintiff failed to identify who these invitees were.

Plaintiff's president (Mr. Buchanan) testified that the he wanted to conduct a sales seminar so that he and other Danville employees could "meet personally ... the customers that [Danville] had been doing business with [and who the salesmen] had not had the opportunity to meet...." Tr. 15. The goal of such a "meeting," according to

Mr. Buchanan, was to have discussions with the customers over a period of days in order to ascertain how Danville could "do a better job" (Tr. 15), to cut down on the travel expenses its salesmen incurred on customer visits, and to "increase ... business." Tr. 29. Because customers rarely participated in previously planned Danville plant visits (Tr. 15), plaintiff decided to arrange "some type of sales meeting" in conjunction with a sporting event to boost attendance. Tr. 15. The first of such sales seminars was conducted, in 1980 in Los Angeles, California, and coincided with the then scheduled Super Bowl. Tr. 27.[8] Expenses relative to that seminar are not currently before this court. A second alleged sales seminar was conducted in January 1981, in New Orleans, Louisiana, once again, in conjunction with the then scheduled Super Bowl. The entertainment expenditures incurred and deductions claimed with respect to the 1981 event are the source of the issues currently before the. court.

In making initial arrangements for said 1981 event, Danville sent a letter, dated June 5, 1980, to Abbott Tours, a travel agency, in New Orleans, Louisiana, which stated in pertinent parts therein that:

Our company plans to invite approximately 120 of our customers to the *1981 Super Bowl.* We are interested in *a package including* three nights hotel accomodation [sic], preferably The Marriott, game tickets, banquet facilities for one night, and possibly a *Mississippi River cruise.*

If your company can provide these services, we would like to hear from you.

Pltf's Ex. 2 (emphasis added). Notably missing from the letter of inquiry is *any* reference to a business purpose by expressing a desire to hold a "sales seminar" in conjunction with attending the Super Bowl. Moreover, no request was made for access to meeting rooms to carry out any legit-

---

**7.** In 1980, the shareholders phased out Multi Ply's cut-to-size business and transferred same to Danville. Thereafter, Multi Ply manufactured thin panels. Tr. 273, 276.

**8.** Mr. Buchanan testified that Danville's 1980 Super Bowl seminar was "very successful" because 1980 sales to the invitees increased $1,936,000 over the 1979 sales to those same customers ($6,340,000—$4,404,000). Tr. 27.

imate business purposes whatsoever. In fact, we fail to find one scintilla of evidence in said letter from which it can be reasonably inferred that the writer was desirous of engaging in any activity that could be directly related to or associated with the active conduct of plaintiff's business. To the contrary, we can only find that the prime and sole activities referenced therein were the desire to attend the 1981 Super Bowl football game and undertake a Mississippi River cruise.

Nonetheless, we further note that in response to Danville's June 5, 1980 letter, Abbott Tours forwarded to Danville a standard "flyer" advertising its "SUPER SHERATON INTERNATIONAL PACKAGE." Pltf's Ex. 3. Therein the offering was simply described as *"a deluxe 4–day Super Bowl 1981 package from Jan. 23rd–26th."* Pltf's Ex. 3 (emphasis added). Said *package*, which Danville ultimately purchased, included: (i) four days/three nights accommodations at the Sheraton International; (ii) round trip transfers from the airport to the hotel; (iii) a split of champagne; (iv) three breakfasts (Saturday, Sunday and Monday); (v) three dinners (Friday, Saturday and Sunday); (vi) one luncheon buffet on Saturday; (vii) round trip shuttle transportation from the hotel to the game; and (viii) all taxes and gratuities as well as charges for planning and operation. Pltf's Ex. 3. Because the Super Bowl football game tickets were *not* included in this package, Danville purchased them separately through other sources. Pltf's Exs. 3, 7a through 7y. Moreover, no effort was made, thereafter, by plaintiff to Abbott Tours, the Sheraton International Hotel, or any other entity, to provide appropriate space and other amenities to facilitate the holding of a business sales seminar.

In deciding which of its customers to invite to New Orleans, Danville claims to have considered the following: (i) the potential for sales growth; and (ii) the current volume of business from the customer. Tr. 33, Deft's Ex. 2, p. 9. Danville did not invite specific individuals, but rather directed the invitation to the customer, allegedly with instructions that two appropriate *deci-*

*sion-making representatives be selected.* Tr. 33. No proof of this direction (other than Mr. Buchanan's assertion) was adduced into evidence at trial. Despite Danville's alleged direction to the invited customers that they only send people "who were decisionmakers ... and who were actively involved in purchasing and selling the type of plywood that [Danville] manufactured" (Tr. 33), as previously noted, numerous customers' wives (37) and children (2) were sent to New Orleans at Danville's expense. Jt. Ex. 1, pp. 9–10.

After Danville had decided which customers would receive an invitation, by letter dated January 13, 1981, the prospective invitees were instructively advised as follows:

Dear [name of attendee]:

*Super Bowl weekend* is just around the corner.

Enclosed is a voucher which you will need for transportation from The New Orleans Airport to The Sheraton International Inn.

Upon checking in at the Sheraton, you will be given vouchers for meals and transportation.

Our Saturday program includes dinner at The Sheraton Inn. *We have arranged Bus transportation to and from The French Quarter for Saturday night.* The Bus will leave The Sheraton at 7:00 P.M., 8:00 P.M., and 9:00 P.M., and will leave The French Quarter at 11:00 P.M., 12:00 P.M., and 1:00 A.M.

The Busses [sic] will leave The Sheraton for the Superdome at 3:00 P.M. on Super Sunday.

We look forward to seeing you in New Orleans.

Best Regards,

[signed]

George Buchanan, Jr.

GBB/bea

Enclosure

Deft's Ex. 16 (emphasis added). Once again, the court is constrained to note the complete absence from said letter of any reference whatsoever to business meetings, discussions, sales seminar, round table dis-

cussions, or any other activity even remotely related to furthering the taxpayer's business. Here again the sole focus of said letter was the "Super Bowl weekend," including the additional "program" frills of dinner and a visit to the French Quarter on Saturday night.

The following day, January 14, 1981, plaintiff (Mr. Buchanan) alleges that it distributed an "agenda"[9] for the upcoming program *to its employees.* Tr. 40, 150. Pltf's Ex. 4. Therein, the following "schedule" and information, as summarized, was disclosed:

(i) Virtually all customers would not arrive in New Orleans until Saturday, January 24;

(ii) A hospitality desk would be in the hotel lobby where attendees could get name tags, an "agenda," and otherwise be greeted;[10]

(iii) "An area" just off the main lobby in the hotel would be used for permanent display;

(iv) Saturday evening, a "dinner meeting" would be conducted during which Danville would attempt to promote "Ash panel with the white Mersawa back" and "Rotary Red Oak with Okume and Lauan Backs";

(v) Sunday morning, Roscoe McNair, Danville's vice president of sales, would "announce that [Danville was] considering purchasing a cut-to-size saw";

(vi) The remainder of Sunday morning would be used by the salesmen to gather information about each customer's cut-to-size requirements;

(vii) The attendees would board the game bus at approximately 2:00 p.m.;

(viii) *No dinner meeting* would be conducted on Sunday, but Danville people

would "be available" in the lobby display area until 10:00 p.m.; and

(ix) *No other meetings were scheduled.* Pltf's Ex. 4.

Critical to one or more issues, in addition to the characterization of the invitees, *supra,* is the question as to the time of arrival in New Orleans of said attendees. As will be seen, *infra,* this fact, along with others, may bare on the bona fides of the alleged sales seminar. The record shows, in this connection, that while plaintiff paid for 120 persons to attend the "Super Bowl Weekend," actually only 116 attended (Jt. Ex. 1). However, Defendant's Exhibit 2, p. 3, reflects 120 persons arriving in New Orleans over said three (3) day period. We find that plaintiff has failed, in its proof, to reconcile the variance, *i.e.,* the missing four persons. Notwithstanding and because of our holding herein, we deem this issue to be moot. The attendees as reflected in the chart, *supra,* can be broken down on the basis of their arrival as follows:

| Date | Day | Number Arrived |
|------|-----|----------------|
| 1/22/81 | Thursday | 6 |
| 1/23/81 | Friday | 37 |
| 1/24/81 | Saturday | 77 |
| Total | | 120 |

(*see* Deft's Ex. 2, p. 3). Additionally, at the trial, Mr. Buchanan testified, at Tr. 46, in response to activities held in New Orleans on Friday, January 23, 1981, as follows:

Q. And did you hold any business discussions or meetings on Friday night?

A. I was in business meetings all day Friday.

Q. ... Approximately how much time would you say was spent on Friday in business meetings and discussions?

---

**9.** We note, however, that subject "agenda," supposedly given to Danville employees, hardly reflects a planned schedule that a reasonable entity would disseminate to employees in preparation for a *bona fide* business meeting or conference. The happenstance structure and content of said agenda and the surrounding testimony leads the court to conclude that it was, at best, prepared as an "afterthought."

**10.** No evidence or testimony regarding an "agenda" given to the *attendees* was produced at trial. The inference we draw is that none was distributed. Testimony did establish, however, that at least one attendee was given "a list" of items manufactured by Danville. Tr. 206. However, Mr. Buchanan contradicted the foregoing at Tr. 150 when he testified that—"We did not have a general list that we could give one list to all customers."

A. I would guess that I spent eight or ten hours, because I was still meeting with customers well into the night.

Surprisingly, Plaintiff's Response to Defendant's First Set of Interrogatories, which was received in evidence as Defendant's Exhibit 2, p. 3b, discloses that Mr. and Mrs. George Buchanan and their three children arrived in New Orleans on Saturday, January 24, 1981, not on Friday, January 23, 1981. Similarly, Mr. Don Sorenson, branch manager of Sequoia Supply Company, Minneapolis, Minnesota, testified that he attended the "Super Bowl weekend" in New Orleans, arriving there Friday afternoon, January 23, 1981. The following questions and answers are enlightening:

Q. Shortly after you arrived in New Orleans did you meet up with George Buchanan or Roscoe McNair?

A. Yes. Actually both of them. We met them at the hotel as soon as we got there from the airport. [Tr. 233]

Q. ... approximately how much time would you say was spent discussing business with George Buchanan or Roscoe McNair?

A. ... my approximate guess would be two to three hours each day....

Q. That would include Friday, Saturday?

A. And a little bit on Sunday.... [Tr. 234–235]

Q. ... so you met Mr. Buchanan and Mr. McNair Friday when you arrived at the hotel. Is that correct?

A. Yes....

A. That's correct, yes. [Tr. 243].

As with Mr. Buchanan, Deft's Ex. 2, p. 3b, also shows that Mr. McNair did *not* arrive in New Orleans until Saturday, January 24, 1981, and not on Friday, January 23, 1981, as Mr. Sorenson testified, *supra.* This fact is indisputable because even Mr. McNair so testified, *infra:*

Q. When did you arrive in New Orleans for the sales seminar?

A. I think it was Saturday afternoon....

Q. Is there any particular reason why you arrived Saturday, not Friday?

A. Well, I flew down Saturday morning. I couldn't get a flight out Friday, so I flew down Saturday morning. As a matter of fact, I flew in with one of my customers.

Q. And which customer was that?

A. Will Gregory. [Tr. 166].

The court finds that Will Gregory did in fact arrive in New Orleans on Saturday, January 24, 1981 (Deft's Ex. 2, p. 3a). Further, the court finds, given the admission of plaintiff, that "[t]he [customers'] spouses were brought solely by choice of the attending representatives." That is to say, they were *not* invited by plaintiff. Similarly, there is no probative evidence in the record that the spouses of plaintiff's attending employees were invited. Thus, we find that they "were brought to meet and entertain the spouses of the representatives who attended." (Deft's Ex. 2, p. 3d).

A group dinner, which plaintiff alleges was a "dinner meeting," was held sometime Saturday evening (January 24) in the hotel's main dining room, just prior to the invitees' visit to the French Quarter. During said dinner, other hotel guests were also present and serviced by hotel employees in the same dining room. That is to say, the restaurant concurrently conducted its normal business operations while Danville's "dinner meeting" took place. The hotel did not rearrange the tables; therefore, said tables were situated in a normal "dining room" configuration, *i.e.*, most tables seated four individuals. Danville attendees occupied approximately 30 tables in one section of the dining room. There was no prearranged seating for the "dinner meeting."

With respect to business meetings, "[t]here was no general meeting held during the sales seminar" (Deft's Ex. 2, p. 9); "[t]here was no set day, time, or place for the meetings with plaintiff's representatives" (Deft's Ex. 2, p. 4); and "plaintiff cannot state the specific location of each and every meeting between its representatives and its customers. With minor excep-

tions, the meetings were conducted on an individual basis ... within the discretion of the salesman responsible for the customers" (Deft's Ex. 7, p. 3).

Mr. Sorenson best described the happenstance of the "business meeting" when responding to the following questions on direct examination:

Q. Where did these discussions take place?

A. Well, wherever we found George. George had a hospitality desk in the hotel ... and where ever we could catch him ... [Tr. 235]

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Approximately how much time was spent discussing business on Friday?

A. ... I'm going to guess two to three hours, off and on, some with Roscoe and some with George himself, whenever we'd catch them.... [Tr. 236].

We find that of the 116 attendees, 55 were customer representatives. With respect to the plaintiff's six attending employees, they were:

(i) Mr. G. Buchanan, President

(ii) Mr. R. McNair, Vice President/Sales

(iii) Mr. L. Duncan, Sales

(iv) Mr. H. Pritchett, Purchasing Agent

(v) Mr. S. Bray, Plant Manager

(vi) Ms. L. Stroud, Bookkeeper.

Of said six attendees, only Messrs. Buchanan and McNair testified as to alleged business discussions. To the extent that there were business discussions with customers, as testified, the record shows that only Messrs. Buchanan and McNair engaged in such discussions. Additionally, direct evidence establishes such discussion with no more than 11 of the 55 attending customer representatives. Mr. Buchanan *implied* that Mr. Duncan and the other employees of plaintiff discussed business with the customer representatives. However, inasmuch as plaintiff failed to call the other four employees as witnesses to testify, and did not explain its failure to do so, an adverse inference is warranted. *See Weeks Dredging & Contracting, Inc. v.*

*United States*, 13 Cl.Ct. 193, 233 (1987), and cases cited therein.

After dinner, buses were available to take customers to the French Quarter. The shuttles left the hotel on or about 7:00 p.m., 8:00 p.m. and 9:00 p.m. (Deft's Ex. 16), and returned from the French Quarter at 11:00 p.m., 12:00 midnight, and 1:00 a.m. (Deft's Ex. 16). Sunday morning (January 25), George Buchanan and Roscoe McNair spoke with customers and attendees in the lobby. Sunday afternoon, at approximately 3:00 p.m., the invitees and Danville employees boarded the bus to the Super Bowl. The group returned to the hotel at approximately 8:00 p.m. No business was conducted after the game.

Plaintiff filed timely federal corporate income tax returns for the fiscal years ended November 30, 1980 and November 30, 1981. Jt. Ex. 1, p. 2; Jt. Ex. 2; Jt. Ex. 3. On said tax returns, Danville deducted the entertainment expenses incurred with respect to the "Super Bowl weekend" on line 23, entitled "Advertising" (Jt. Ex. 1, p. 4; Jt. Ex. 2; Jt. Ex. 3), despite the fact that Danville admittedly did not normally incur advertising expenses. Tr. 14. Specifically, of Danville's claimed expenses totalling $103,444.51 ($27,151.00 for payments for Super Bowl tickets; $30,721.51 for payments for air fare of Danville's employees and guests; $45,300.00 for payments to Abbott Tours for the accommodations and services provided; and $272.00 to General Aviation to pick up football tickets), $98,297.83 was disallowed. Jt. Ex. 1, p. 11. Of this amount, $64,467.51 was disallowed on plaintiff's fiscal year 1980 income tax return, and the balance of $33,830.32 was disallowed on its fiscal year 1981 income tax return. Jt. Ex. 1, p. 4.

Following an audit of the plaintiff's tax returns, on June 10, 1982, the Internal Revenue Service sent Danville a revenue agent's report disallowing said deductions claimed for "Super Bowl weekend." Danville paid the tax assessment, and on February 16, 1984, filed amended returns seeking refund of the additional taxes paid as a result of the disallowances. The Commissioner denied the refund claims, and the

instant action was thereafter filed in this court.

CONTENTIONS

A. *Plaintiff*

Essentially, plaintiff maintains that all expenses incurred (for every category of attendees) to host the sales seminar in New Orleans were ordinary and necessary to the conduct of its business as contemplated by § 162 of the 1954 Internal Revenue Code. Conceding in its post-trial brief that said costs are entertainment expenditures, plaintiff also claims that they are directly related to, or associated with, the active conduct of its business as those phrases are used in said Code § 274. Finally, the plaintiff submits that the expenses incurred to host subject seminar were adequately substantiated.

B. *Defendant*

On the other hand, defendant contends that none of the expenses attributable to said event are deductible because they were neither ordinary and necessary, directly related to, nor associated with plaintiff's trade or business as those phrases are defined under applicable provisions of the Code and Treasury regulations. Moreover, defendant contends that, even assuming arguendo that some portion of the expenses were deductible, those expenses incurred to defray the costs for attending spouses, children, friends, and others who were *not* Danville customers were not deductible.

Finally, defendant avers that, even if the court were to find that some or all of the expenses were otherwise deductible, plaintiff is not entitled to a refund because it has not adequately substantiated said deductions. In this respect, defendant argues that the plaintiff has failed to demonstrate, with the requisite *strict* particularity, how much it paid for each Super Bowl ticket and meals for each particular attendee.

ISSUES

Considering the foregoing, the dispositive issues raised can be succinctly identified as follows. Broadly stated, we must determine—whether plaintiff has demonstrated, with respect to *any* class of attendee, that subject expenditures were: (i) ordinary and necessary as contemplated by § 162 of the Code; and either (ii) "associated with" the active conduct of plaintiff's business as contemplated by Code § 274; or (iii) "directly related" to the active conduct of plaintiff's business as contemplated by § 274 of the Code. If we find favorably for plaintiff under either scenario, the court would be further required to determine—whether plaintiff has adequately substantiated the cost of each particular allowable expenditure as required by applicable statutes and regulations.[11] Inasmuch as we conclude, *infra,* that plaintiff fails to meet its burden as to the deductibility of subject payments, the substantiation requirements of § 274 are moot.

DISCUSSION

A. *Burden of Proof*

At the outset, we observe that operating in the instant tax refund suit is the rebutable presumption that the Commissioner's determination (*i.e.,* that subject expenditures are neither ordinary and necessary, associated with, nor directly related to the active conduct of plaintiff's business) is correct. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Puritan Lawn Memorial Park Cemetery v. United States,* 15 Cl.Ct. 234, 240 (1988); *U.S. Shelter Corp. v. United States,* 13 Cl.Ct. 606, 621–22 (1987). This presumption in favor of the Commissioner is a procedural device that requires the plaintiff to go forward with prima facie evidence to support a finding contrary to the Commissioner's determination. *See Meridian Wood Products Co., Inc. v. United States,* 725 F.2d 1183, 1189 (9th Cir.1984). Once this procedural burden is satisfied, "the taxpayer must still carry [the] ultimate

11. On brief, defendant also raises an issue as to whether Danville may deduct any expenses attributable to the business of Multi Ply, if the claimed deductions are herein allowed. Inasmuch as we conclude, *infra,* that plaintiff is not entitled to any refund of subject taxes, this issue is moot.

burden of proof or persuasion" on the merits. *Meridian Wood Products,* 725 F.2d at 1189, *citing to, Rockwell v. Commissioner,* 512 F.2d 882, 885 (9th Cir.), *cert denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). Thus, the plaintiff not only has the burden of proof of establishing that the Commissioner's determination was *incorrect,* but also of establishing the merit of its claims by a preponderance of the evidence. *See Meridian, supra,* 725 F.2d at 1189; *Rockwell,* 512 F.2d at 885. In short, to prevail, plaintiff is compelled to introduce probative evidence that would lead the court to conclude that the facts upon which it relies (to prove the deductibility of subject expenses) are, at the very least, probably true. *See Raymark Industries, Inc. v. United States,* 15 Cl.Ct. 334, 343 (1988), *citing to,* C. McCormick, *McCormick's Handbook of the Law of Evidence* § 336 (1972); and *Burch v. Reading Co.,* 240 F.2d 574, 579 (3d Cir.), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957).

As noted early on, *supra,* we conclude that plaintiff has thoroughly failed to meet its burden on the merits. We now undertake to address the issues, *infra,* seriatim justifying that conclusion.

### B. *Were the Expenses Incurred Ordinary and Necessary Business Expenses Under § 162 of the Code?*

It is important to note, at the outset, how § 162 of the Code works in tandem with § 274 in determining the deductibility of entertainment expenses. In addressing this point, the court in *Berkley Machine*

*Works and Foundry Co. v. Commissioner of Internal Revenue,* 623 F.2d 898, 901 (4th Cir.1980), stated that:

> Ordinary and necessary business expenses of a taxpayer are deductible under § 162 of the Internal Revenue Code. Business entertainment and travel expenses are governed by this provision, *but will be disallowed if they fail to satisfy the more rigorous requirements of § 274(a) as well as the substantiation provisions of § 274(d).*

(emphasis added). It is clear from the above, therefore, that our initial task is to determine whether on this record plaintiff has sufficiently rebutted the presumption favorable to the Commissioner and has proven, by a preponderance of the evidence, that it is entitled to claim the expenses incurred for the "1981 Super Bowl Weekend."

Section 162 of the 1954 Code provides in relevant part as follows:

> (a) In General.—There shall be allowed as a deduction all the *ordinary* and *necessary* expenses paid or incurred during the taxable year in carrying on any trade or business, including—
>
> (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
>
> (2) traveling expenses (including amounts expended for *meals and lodging other than amounts which are lavish or extravagant* under the circumstances) while away from home in the pursuit of a trade or business....

(emphasis added). *See also* Treas.Reg. §§ 1.162–1 and 1.162–2 [12] and *Commissioner v. Tellier,* 383 U.S. 687, 689, 86 S.Ct.

---

**12.** Treas.Reg. § 1.162–2 provides in relevant part:

(a) Traveling expenses include travel fares, meals and lodging, and expenses incident to travel such as expenses for sample rooms, telephone and telegraph, public stenographers, etc. Only such traveling expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted. If the trip is undertaken for other than business purposes, the travel fares and expenses incident to travel are personal expenses and the meals and lodging are living expenses. If the trip is solely on business, the reasonable and necessary traveling expenses, including travel fares,

meals and lodging, and expenses incident to travel, are business expenses. For the allowance of traveling expenses as deductions in determining adjusted gross income, see section 62(2)(B) and the regulations thereunder.

(b)(1) If a taxpayer travels to a destination and while at such destination engages in both business and personal activities, traveling expenses to and from such destination are deductible only if the trip is related primarily to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination. However, expenses while at the destina-

1118, 1119, 16 L.Ed.2d 185 (1966); *Berkley, supra; Dowell v. United States,* 522 F.2d 708, 709 (5th Cir.1975); *Walliser v. Commissioner,* 72 T.C. 433, 437 (1979).

■ Precedent as to what is a "necessary" business expense, as contemplated by § 162, defines that term as imposing only the minimal requirement that the expense be "appropriate and helpful" for the development of the taxpayer's business. *See Tellier,* 383 U.S. at 689, 86 S.Ct. at 1119. On the other hand, the term "ordinary" functions to encompass only those payments which, experience has shown, are *common and accepted* in the community of which the taxpayer is a part. *See Welch,* 290 U.S. at 113–14, 54 S.Ct. at 8–9. Because these terms are conjunctively used in the statute (rather than alternatively), we hold that in order to meet its burden, plaintiff must initially demonstrate that such activity (as that conducted during the 1981 "Super Bowl weekend") is *commonly accepted* in its business community and is also *appropriate* and helpful as a means of developing and furthering business. This determination is essentially a factual question. *See Walliser,* 72 T.C. at 437, *citing to, Commissioner v. Heininger,* 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171 (1943); *Henry v. Commissioner,* 36 T.C. 879, 883 (1961). Therefore, we must look to the evidence submitted by plaintiff with regard to each classification of attendees.

### I. *Class of Attendees*
#### 1. *The Children*

Plaintiff has made the *incredulous* assertion that *not only* are the Buchanan children's expenses allowable under § 162, but also the expenses of the children of its customer representatives. Pltf's Reply Br. pp. 29–31. To this end, plaintiff states that the Buchanan children "manned the hospitality desk," greeted customers, and passed out name tags, an agenda, and other important unidentified information. Pltf's Reply Br. p. 30. Reference is made to Plaintiff's Exhibit 4 (the agenda that was supposedly given to Danville employees just prior to the trip) as proof that such "services" were actually rendered. The Buchanan children's assistance, plaintiff maintains, "undoubtedly freed up the Danville Plywood employees and enabled them to conduct business meetings and discussions with customer representatives." Pltf's Reply Br. p. 30. Plaintiff makes no argument (other than Mr. Buchanan's bland assertions) regarding the deductibility of the expenses of the customers' children under § 162.

The relevant regulation, *i.e.,* Treas.Reg. § 1.162–2(c), essentially provides that where a taxpayer's family member accompanies him on a business trip, such expenses as a general rule are *not* deductible *unless* it is adequately shown that the family member's presence had a bona fide business purpose. Performance of an incidental service does not qualify as a deductible business expense. Treas.Reg. § 1.162–2(c). In this connection, giving the term "incidental" its customary meaning, *see Hanover Bank v. Commissioner of Internal Revenue,* 369 U.S. 672, 687, 82 S.Ct. 1080,

---

tion which are properly allocable to the taxpayer's trade or business are deductible even though the traveling expenses to and from the destination are not deductible.

(2) Whether a trip is related primarily to the taxpayer's trade or business or is primarily personal in nature depends on the facts and circumstances in each case. The amount of time during the period of the trip which is spent on personal activity compared to the amount of time spent on activities directly relating to the taxpayer's trade or business is an important factor in determining whether the trip is primarily personal. If, for example, a taxpayer spends one week while at a destination on activities which are directly related to his trade or business and subse-

quently spends an additional five weeks for vacation or other personal activities, the trip will be considered primarily personal in nature in the absence of a clear showing to the contrary.

(c) Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses. The same rules apply to any other members of the taxpayer's family who accompany him on such a trip.

1088, 8 L.Ed.2d 187 (1962), we deem such to refer to acts of a minor, casual, or subordinate nature. *See Webster's II New Riverside University Dictionary* 618 (1984). Therefore, plaintiff is compelled to demonstrate that the deeds of the Buchanan children amounted to more than subordinate acts, considering the environment in which they occurred. Moreover, it must demonstrate that the customers' children's attendance served some bona fide business purpose. We conclude that plaintiff did not and cannot, on this record, establish these elementary prerequisites.

■ As previously noted, *supra,* in note 9, proffered to establish that the Buchanan "family" manned the hospitality desk, Plaintiff's Exhibit 4 lacks even minimal credibility. Said document, scant of even a pretense of bona fides, can hardly be found probative of a viable business agenda that admittedly cost the plaintiff well-nigh $100,000.00. Even assuming *arguendo* that this self-serving document could be deemed to be *ipso facto* probative, and it clearly is not, the mere act of manning the hospitality desk constitutes but a "minor" chore, given the threshold characterization of the trip, *i.e.,* "1981 Super Bowl weekend." Moreover, there was no testimony (except Mr. Buchanan's uncorroborated self-serving declarations) which we feel compelled to credit as to the extent or the bona fides of his children's alleged services. Furthermore, the relative *ages* of the children were not disclosed on the record.

■ Plaintiff's expenditures for the Buchanan children simply cannot, on this record, be found to have been ordinary and necessary as that phrase is used in § 162. Indeed, plaintiff offered no proof, other than Mr. Buchanan's assertions on the point, to establish that it was a common industry practice to use "children" to host plywood sales seminars, *and* that such use was appropriate and helpful to the development of its business. *See Tellier,* 383 U.S. at 689, 86 S.Ct. at 1119; *Welch,* 290 U.S. at 113–14, 54 S.Ct. at 8–9.

Therefore, without belaboring the point, we find that it is clear beyond cavil that there simply is no rational basis, on this record, upon which plaintiff can prove that the attendance of the Buchanan children (and payment for their expenses) in any way was appropriate, ordinary, and necessary under § 162. The record does not contain one scintilla of probative evidence supportive of this proposition. Additionally, because plaintiff offered absolutely *no* evidence as to why the *customers'* children's expenses should have been allowed, we conclude that plaintiff has also failed to rebut the Commissioner's initial determination on this issue. *See Welch,* 290 U.S. at 115, 54 S.Ct. at 9. Accordingly, we find that the Commissioner properly disallowed the "1981 Super Bowl weekend" expenses as they relate to all of the attending children.

### 2. Mr. Buchanan's Friends and Martha Chukinas

Similarly, we find no creditable basis upon which to overturn the Commissioner's determination under § 162 relative to either Martha Chukinas or Mr. Buchanan's four friends, *i.e.,* Mr. Averett Brumfield and son, and Mr. and Mrs. Doug Dalton.

Dispositive of the issue relative to Ms. Chukinas is plaintiff's *admission* that her attendance served "no business purpose." *See* Deft's Ex. 2, p. 6. *In claris non est locus conjecturia* —"In things obvious there is no room for conjecture." *Black's Law Dictionary* 687 (5th ed. 1979). Therefore, without further discussion, we find that Ms. Chukinas' expenses were properly disallowed because admittedly they were not ordinary and necessary under § 162.

■ With respect to Mr. Buchanan's friends (*i.e.,* his admitted "non-business associates"), plaintiff has adopted the position that, because the four tickets were originally purchased for Danville customers (Vaughn Plywood and Allied Charleston)—with whom plaintiff *would* have had business discussions if they had not, "at the last minute," notified plaintiff that they could not attend (Pltf's Br. p. 32; Deft's Ex. 2, p. 5)—the deduction should be allowed because the cancellations were beyond plaintiff's control. Pltf's Br. pp. 26–

32. We find this assertion to be untenable and must conclude that plaintiff is not entitled to the deduction for Mr. Buchanan's friends' expenses under § 162. The adduced facts compel no conclusion other than said expenditures (*i.e.,* with respect to Mr. Buchanan's "non-business associates") are not ordinary and necessary to the conduct of plaintiff's business. We find no proof that they were "appropriate and helpful," nor do we find any evidence that they are commonly accepted.

Other than Mr. Buchanan's naked representation that two customers *had* to cancel, and his four friends made the trip in their places, there is no evidence whatsoever in the record to establish the pivotal facts. In order to properly invoke § 162, plaintiff must show that the expenses incurred were primarily for business rather than social reasons, *and* the proximate relationship between the cost and the business. *Accord Walliser,* 72 T.C. at 437. The fact that plaintiff has failed to adduce probative evidence through the cancelling customers, that they in fact could not attend (and thereby at least indicate that the ticket purchase and associated activity expenses *may* have had a business purpose), prohibits plaintiff from demonstrating the requisite proximate relationship between the costs and its business. Moreover, all that was proffered on this issue was the uncorroborated self-serving testimony of Mr. Buchanan. Accordingly, we find that the presumptive correctness of the Commissioner's determination has not been rebutted on this issue and, consequently, we deny refund of said amounts (as they relate to Mr. Buchanan's four non-business associates) requested under § 162.

### 3. Spouses of Employees and Customers

■ Addressing next the question— whether expenses of the spouses of Danville's employees and customers are deductible under § 162, we conclude that such were, likewise, properly disallowed by the Commissioner because the plaintiff failed to rebut the presumption, *supra,* and establish that the spouses' presence served a bona fide business purpose. *See Weather-*ford v. United States, 418 F.2d 895, 897 (9th Cir.1969); *Poletti v. Commissioner of Internal Revenue,* 330 F.2d 818, 823 (8th Cir.1964).

Pertinent to the foregoing issue are the following background facts. In Plaintiff's Exhibit 2, its June 5, 1980 initial letter to Abbott Tours, plaintiff stated that: "Our company plans to invite approximately *120 of our customers* to the 1981 Super Bowl." (emphasis added). It appears that approximately 58 "customers" were invited. The details of said invitation are further explicated in Defendant's Exhibit 2, p. 5 as follows:

### *Answer 3*

(a) Danville Plywood Corporation chose its invitees based on two criteria....

(b) Danville Plywood Corporation invites *customers* not individuals. It allows the customer to choose the *two* representatives it wishes to send....

(emphasis added). The record shows that, notwithstanding the fact that plaintiff did not invite the wives of the attending customer representatives, apparently said customers, *sua sponte,* elected to send 37 spouses because they were brought solely by choice of the attending customer representatives. In fact, Mr. Buchanan testified that "we made it clear that we wanted to meet with people who were the decision makers and ... who were actively involved in purchasing...." Tr. 33. Certainly there is no probative evidence that the spouses were so involved.

With respect to the attending five spouses of plaintiff's attending employees, plaintiff admits in Defendant's Exhibit 2, p. 3d that "The spouses were brought to meet and entertain the spouses of the representatives who attended."

The applicable Treasury regulation, *i.e.,* § 1.162–2(c) (see note 12 *supra* ), generally provides that where a spouse of an employee of a taxpayer accompanies him/her on a business trip, expenses relative to that spouse are not deductible *unless* it is adequately *demonstrated* that the spouse's presence on said trip had a "bona fide"

business purpose. In other words, the taxpayer must prove that said spouse "provided *substantial* services *directly* and *primarily* related to the carrying on of [its business]." *Weatherford*, 418 F.2d at 897 (emphasis in original). Thus, if the spouse's *primary* function was merely to be "socially gracious," the taxpayer may not deduct his or her expenses under § 162.

As previously noted, plaintiff submitted Exhibit 4 (the agenda allegedly given to Danville employees) to demonstrate that the Buchanan family, including the wife, had a "role" in the dynamics of the alleged seminar activity at the "1981 Super Bowl weekend." As hereinbefore noted, we do not deem that hospitable document to be credible probative evidence of the ultimate "facts" articulated therein. Moreover, even assuming *arguendo* that said agenda were to be elevated to the level of "proof positive"—that Mrs. Buchanan and the other spouses of Danville's attending employees "manned" a hospitality desk in the lobby and were also responsible for "getting everyone on the right bus before and after the game"—case precedent establishes that such frivolous and primarily social gestures do not give rise to a substantial professional business function. *See Weatherford*, 418 F.2d at 897. Therefore, we conclude that the Commissioner properly disallowed expenses related to Mrs. Buchanan.

Likewise, other Danville spouses' expenses and customers' spouses' expenses were properly disallowed. Mr. Buchanan blandly asserted that having the Danville spouses present was "advantageous" because customers brought their wives, and (somehow) this situation, "just kind of made it natural." Tr. 43. No other probative evidence was submitted to indicate exactly what *business function* these spouses served. The record shows no functions except what is contained in self-serving Plaintiff's Exhibit 4. Moreover, none of the spouses testified as to any activities performed or the bona fides thereof. Against this background, any reasonable inferences deductible from such failures must, of necessity, be adverse. *See Weeks*, 13 Cl.Ct. at 233. We, therefore, conclude

that plaintiff has merely attempted to justify one non-deductible expense with another non-deductible expense. This ill-conceived strategy is insufficient to overcome plaintiff's burden, because the rationalization does not establish that *any* spouse provided substantial services that were directly and primarily related to the carrying on of Danville business. *See Weatherford*, *supra*, at 897.

Accordingly, we conclude that subject spouses' expenses were properly disallowed by the Commissioner, there being no evidence in the record warranting a contrary conclusion.

### 4. Representatives of Danville's Customers and Customers of Danville's Customers

■ The question here is simply—whether the expenses incurred to "invite approximately [55] of [Danville's] customers to the 1981 Super Bowl" (Pltf's Ex. 2) were ordinary and necessary to the carrying on of plaintiff's trade or business. We conclude that they were not.

As previously explained, for purposes of § 162, an "ordinary" expense is one which is common *and* accepted in the community of which the taxpayer is a part, *Welch*, 290 U.S. at 113–14, 54 S.Ct. at 8–9; and a "necessary" expense is one which is not only helpful, but more importantly, "appropriate" for the development of the taxpayer's business. *See Tellier*, 383 U.S. at 689, 86 S.Ct. at 1119.

Mr. Buchanan testified in a rather vague manner that such meetings (*i.e.*, "Super Bowl weekend[s]") were "common" in the plywood industry. However, neither Mr. Buchanan nor any other witness specifically identified any other companies that have conducted programs of this type, nor did they offer any probative statistical data which would verify that this was indeed a common practice within the plywood industry. To the contrary, the one witness who testified on the point beyond bland conclusory statements, Mr. Gregory, tended to discredit plaintiff's position, albeit, unintentionally.

Mr. Gregory testified that in addition to the Danville program, he had also attended the National Building Materials Distributors Association's seminars. Tr. 220–21. There, the Association offered "cutaway seminars" on management or market conditions, among other things. Booths were manned by vendors where the attendees could talk privately about the company's available products. Tr. 221.

We believe that what plaintiff truly purchased is evidenced in Plaintiff's Exhibit 3, which was Abbott Tours' response to plaintiff's inquiry of June 5, 1980 (Pltf's Ex. 2). As previously described and detailed, *supra*, it was nothing more than "a deluxe 4–day Super Bowl 1981 package from June 23rd–26th." Nowhere in either exhibit is there any mention of a sales seminar. The sole notion in both communications exclusively referenced the 1981 Super Bowl extravaganza.

Based upon the foregoing, we conclude that plaintiff's hospitably characterized "Super Bowl Sales Seminar" was little more than a group social excursion to the 1981 Super Bowl, as clearly depicted in its letter to Abbott Tours. *See* Pltf's Ex. 2 and Deft's Ex. 16. Plaintiff's Exhibit 2 requested accommodations solely and exclusively for the Super Bowl weekend, *not* a plywood seminar. As one Danville employee testified, there was no organized program (Tr. 193), only random conversations with attendees, not all of which were about business. Tr. 194. In response to the court's questions, Mr. Don Sorenson testified as follows (at Tr. 246–47):

Q. [W]ere any of those meetings prearranged?

A. No, I can't really say that they were prearranged....

Q. So, that, the meetings that you had ... were just happenstance....

A. That's right.

More importantly, this record inescapably demonstrates that the entertainment, *i.e.*, the trip to the French Quarter and the Super Bowl game, was the *central* focus of the excursion, with all other activities running a distant second in importance.

We, therefore, find that plaintiff has failed to even minimally prove that the alleged sales seminar of the type conducted the weekend of January 23 through 26, 1981, was "common" in the plywood industry *and appropriate* for the development of Danville's business. Accordingly, we agree with the Commissioner that all expenditures relative to Danville's customer representatives are not deductible under § 162. *A fortiori*, expenditures defraying the cost of the Super Bowl weekend for customers (Mr. Bob Smith, Mr. Ed Zelenka, and Mr. Robert Zelenka) of the plaintiff's customers are similarly not deductible.

### 5. Danville's Employees

For the reasons set forth below, we also conclude that expenses incurred to send Danville's six employees to the 1981 Super Bowl weekend are not deductible under § 162 of the Code.

■ The traveling expenses of the Danville employees would be deductible *only* if they are found to have been *reasonable* and *necessary* to the conduct of Danville's business and *directly attributable* to it. Treas.Reg. § 1.162–2(a) (*see* note 12, *supra*). If the trip was *undertaken* for *other than* business purposes, the travel fares and expenses incident to travel are deemed to be personal expenses and the meals and lodgings are living expenses. As such, they are not deductible under § 162. Treas.Reg. § 1.162–2(a). Whether a trip is related primarily to the taxpayer's business or is primarily personal depends upon the particular facts in each case, and the court must consider the amount of time during the period of the trip that was spent on personal activity compared to that spent on business activity. Treas.Reg. § 1.162–2(b)(2). Of course, the foregoing regulations assume that the taxpayer has met the requirement that said expenses are ordinary and necessary. *See Tellier*, 383 U.S. at 689, 86 S.Ct. at 1119. As we have previously determined, plaintiff even failed to establish this threshold fact.

Notwithstanding plaintiff's failure to establish that subject expenses were ordinary and necessary, we further conclude that it

also has *failed* to establish that the expenses were *attributable* to Danville's business, and that the trip was undertaken *primarily* for business purposes. As previously noted, none of the pre-program correspondence references the *business* nature of the trip. To the contrary, it is indisputed that the sole focus and references were with regard to the details relating to the 1981 Super Bowl weekend. *See* Pltf's Ex. 2, *supra*, and Deft's Ex. 16, *supra*. To the extent that the agenda (Pltf's Ex. 4), as previously stated, describes an alleged sales seminar, we believe the circumstances surrounding the issuance of this document indicates that it was merely a bootstrapping afterthought.

Also, plaintiff offered virtually *no* evidence as to how four of the six Danville employees (Mr. S. Bray, Plant Manager; Mr. L. Duncan, Sales Representative; Ms. L. Stroud; and Mr. H. Pritchett, Purchasing Agent) supposedly spent their time. Will Gregory testified that Mr. Duncan "was telling [him] about six and seven foot panels"; that he talked to Mr. Duncan at least two or three hours basically in the reception area in the Sheraton; and that he also talked with the plant manager, Mr. Bray. Nothing except these bland obscure assertions were made as to the nature of his discussions with Mr. Duncan and Mr. Bray. Such evidence is not convincing, at least to this court, that the above four individuals actively engaged in *substantial* and *bona fide* business discussions with any of the invitees. Therefore, there is no creditable evidence establishing that their expenses were attributable to Danville business. Moreover, to the extent that testimony indicates that Messrs. Buchanan and McNair engaged in "some talk" with respect to Danville's business during subject weekend, we do not find such social interaction sufficient to establish, by a preponderance of the evidence, that the Super Bowl trip was *undertaken primarily* to further plaintiff's business purposes. *See Meridian*, 725 F.2d at 1189.

The fact that the alleged meetings and discussions were primarily social interactions rather than business can even be gleaned from the testimony of plaintiff's witnesses, Messrs. Buchanan, McNair, O'Brien, and Sorenson.

Mr. Buchanan testified that "meetings" were conducted: (i) in front of the hotel; (ii) in the hotel lobby; (iii) in the hotel lounge bar; (iv) in a couple of little rooms adjacent to the lobby; and (v) in the restaurant during dinner. Tr. 59–60. He also stated that *no* formal business meetings were conducted with the customers because Danville did not have a product that could be sold to the entire group. Tr. 60. With respect to the dinner meeting, there was one on Saturday (Tr. 38); he has no knowledge who was sitting with whom and what the conversation was about (Tr. 157–58); everyone was in attendance "as far as [he] could tell" (Tr. 45); they did not hold a general business meeting where all representatives attended (Tr. 60); and when in the hotel *lounge* for meetings "it was ... pretty well utilized by our group" (Tr. 142). A thirty-minute conversation, according to Mr. Buchanan, constituted a "substantial" business meeting. Tr. 142–43. We find that this testimony does little, if anything, to demonstrate that the subject trip was *undertaken* with a business purpose in mind.

First of all, the letter forwarded to Abbott Tours belies any possible suggestion that this excursion was *undertaken* for business purposes. *See* Pltf's Exs. 2 and 3. All that plaintiff indicated therein was that it wanted to take *"120 of [its] customers to the 1981 Super Bowl"* (emphasis added). Expression of the basic intent could not be clearer. Plaintiff also *specifically* requested a Mississippi River cruise, but conspicuously *absent* therefrom was even one remote suggestion of any type of *business* activity. *See also* Deft's Ex. 16. The Abbott letters, *ipso facto*, demonstrate that "The Super Sheraton International Package" was ill-suited to conduct business, and, more directly, establish that business was not the primary concern of Danville. Against this background, we are constrained to conclude that plaintiff simply did not attempt to format the package so that it would be conducive to meaningful business discussions. As the record per-

suasively demonstrates, the attendees were in New Orleans to attend a football game, and to engage in any other entertainment available.

Mr. McNair's testimony also is of little probative consequence. Initially, he vaguely asserted that he spent "half the day" Saturday discussing business, Tr. 167, and "whatever time" prior to getting on the Super Bowl bound bus on Sunday. Tr. 170. When shown a list of attendees (Jt. Ex. 1, para. 12), he became very specific as to what type of wood he discussed with them (Tr. 172–74), but when questioned as to how long these conversations lasted, his confidence and clarity all but evaporated (Tr. 171–75). Consequently, we do not deem such testimony as probative of the conversations that *actually* took place. In connection with how business meetings were held with customers, Mr. McNair testified that—"when I met people coming in I would discuss it with them," and "I talked to other people in the lobby." Tr. 167. When asked to recall with whom he sat at the Saturday dinner meeting, Mr. McNair responded—"[t]hat's pretty hard to do"; he also testified that he moved around, talking to different people, "I was mingling." Tr. 168. Following the Saturday dinner, they went by bus to the French Quarter and when they returned he had a couple of drinks in the bar with some customer representatives; and on Sunday, prior to the Super Bowl game, he went to the hospitality area and mingled. Tr. 168–70. Mr. McNair's testimony is unpersuasive to the extent that it purports to establish that the primary purpose of the New Orleans trip was to conduct a bona fide business sales seminar.

While plaintiff elicited a significant number of obscure and conclusory utterances from its witnesses as to various unilateral business discussions or meetings by its sales people, in truth there were only two Danville employees who testified and they were Mr. McNair and Mr. Buchanan. Mr.

Duncan, a sales representative of plaintiff who attended the excursion, failed to testify. We believe the most *telling* testimony as to the nature of the alleged sales seminar came from the mouth of Mr. Sorenson, the branch manager of Sequoia Supply Company. Mr. Sorenson testified that he arrived in New Orleans on Friday afternoon and, from the time of his arrival on January 23, 1981, he talked with George Buchanan or Roscoe McNair approximately "two or three hours each day" (Tr. 233–34), and that the discussions took place—"wherever we found George ... and where ever we could catch him...." (Tr. 235, 243). This expression is typical of the other two customer representatives (Messrs. Gregory and O'Brien) who testified.

Based upon the foregoing, we conclude that the Commissioner properly disallowed the deductions of Danville employees under § 162. There simply has been no showing, by a preponderance of the evidence, which is the standard measure of persuasion in the ordinary civil case,[13] that the trip was undertaken for bona fide *business purposes* and that the expenses were directly attributable to plaintiff's business. Accordingly, the Commissioner's determination under § 162 must be upheld *in toto*. Such determination, of necessity, requires that plaintiff's complaint be dismissed in its entirety with prejudice. Finally, because business and entertainment expenses are governed by § 162, and we have concluded that plaintiff has failed to demonstrate that subject expenditures were ordinary and necessary for purposes of that section, any discussion relative to § 274, arguably, is rendered academic.

### C. *Section 274 Generally*

Notwithstanding the foregoing, due consideration of § 274 requires a proper understanding of its operation against the facts at bar. "Section 274 is a *disallowance provision*, and operates *only* to disal-

---

**13.** *See Morris v. United States*, 171 Ct.Cl. 220, 228 (1965); and *Hale v. Department of Transportation, F.A.A.*, 772 F.2d 882, 885 (Fed.Cir. 1985), where it is stated: "Preponderance of the evidence, with respect to the burden of proof in civil ... actions ... means the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it...."

low expenses that have *initially been* demonstrated to be allowable under some other section of the Internal Revenue Code." *Andress v. Commissioner of Internal Revenue*, 51 T.C. 863, 866 (1969), *aff'd*, 423 F.2d 679 (5th Cir.1970), *citing to*, H.R.Rep. No. 1447, 87th Cong., 2d Sess., p. 19 (1962); S.Rep. No. 1881, 87th Cong., 2d Sess., p. 27 (1962), United States Code Cong. and Ad. News, p. 3297; *see also, Handelman v. Commissioner of Internal Revenue*, 509 F.2d 1067, 1072 (2d Cir.1975). For purposes of our discussion, as noted, the amount must *first* be deemed deductible under § 162(a) in that such was "ordinary and necessary" to the carrying on of the taxpayer's trade or business. If this threshold requirement is met (and as we have demonstrated, *supra*, in the instant case it was not), and the expenditures constitute entertainment (and the plaintiff freely admits), the taxpayer is further compelled to meet the "unless" requirements of § 274(a)(1)(A) and demonstrate that such items were either directly related to, or associated with, the active conduct of its trade or business. 26 U.S.C. § 274(a); *see generally, Berkley*, 623 F.2d at 902; *Dowell v. United States*, 522 F.2d 708, 710–13 & n. 3 (5th Cir.1975); *Handelman*, 509 F.2d at 1074; *St. Petersburg Bank and Trust Co. v. United States*, 362 F.Supp. 674, 676 (D.Fla.1973), *aff'd*, 503 F.2d 1402 (5th Cir.1974). Finally, if all of the foregoing requirements are met, the plaintiff must then, of course, meet the substantiation and recordkeeping requirements of § 274(d).

Before proceeding with our § 274 analysis, we observe that plaintiff admittedly failed to properly characterize subject expenditures as "entertainment expense" on its fiscal year 1980 and 1981 federal income tax returns. *See* Jt. Exs. 2 and 3. Rather, plaintiff claimed subject expenditures as

"advertising expenses" on said tax returns. *See* Jt. Exs. 2 and 3, line 23. This is true despite the fact that Mr. Buchanan rather forcefully testified that Danville did no advertising *of any sort* and averred that the expenditures at issue purported to bridge this void. Tr. 14.[14] In its post-trial brief, plaintiff "concedes" that subject expenditures were "entertainment expenses and thus subject to the requirements of [s]ection 274." Pltf's Br. p. 19. We agree with this "concession," and, therefore, find that § 274 is otherwise controlling with regard to the subject expenditures.

The legislative history to § 274 indicates that support for this section was generated by a concern that the liberal interpretation afforded the "ordinary and necessary" language of § 162, coupled with the rule of *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir.1930)[15] (generally allowing an approximation of travel and entertainment expenses), led to rampant abuse of the deduction provision, *i.e.*, § 162(a). *See* S.Rep. No. 1881, Sec. IV (1962), *reprinted in*, United States Code Cong. and Ad.News, 87th Cong. 2d Sess., vol. 2, p. 3327 *et seq.* (1962); H.R.Rep. No. 1447, Sec. V, (1962), *reprinted in*, Cum.Bul. 1962–3, p. 405, at 423 *et seq.* (1962). Readily apparent therefrom was the congressional intent "to limit the types of business entertainment otherwise deductible under § 162 by requiring [that such expenditures] meet a more stringent standard of business-relatedness than had theretofore obtained." *Berkley*, 623 F.2d at 902. As noted in *Berkley:*

> [T]he [House] bill provides that a deduction [for entertainment expenses would] be allowed only to the extent that the taxpayer establishes that the expense was directly related to the active conduct of his trade or business. This means that the taxpayer must show a greater degree of proximate relation between the

---

**14.** When questioned on this characterization of subject expenditures, Mr. Buchanan modified his prior testimony to the effect that Danville did not advertise in *trade publications* or *magazines* by stating that he considered the program, "advertising and promotion," nonetheless; and that such was the "only type" of promotion in which plaintiff engaged. Tr. 161. We are not persuaded by Mr. Buchanan's later explanation of subject mischaracterized expenditures.

**15.** In *Cohan*, the Second Circuit permitted an approximation of travel and entertainment expenses actually incurred, rather than require exact determination of the amounts spent. That rule has apparently been effectively overruled by the promulgation of § 274.

expenditure and his trade or business than [was previously] required under ... law. Among other things, [the taxpayer would] have to show more than a general expectation of deriving some income at some indefinite future time from the making of the entertainment-type expenditure....

*Berkley, id., citing to,* H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962) (1962–3 Cum. Bul. 405, 427). Furthermore, "[i]f the words 'directly' and 'active' in the key statutory phrase ... did not of themselves serve to bar ... general good will entertainment ..., then the legislative history of the debate on the 1962 amendment ... indicate[d] a clear Congressional intent that general good will entertainment could no longer be deducted as a business expense." *Hippodrome Oldsmobile, Inc. v. United States,* 474 F.2d 959, 961 (6th Cir.1973).

The operative provisions of § 274, to the issues at bar, state that:

(1) In general.—No deduction otherwise allowable under this chapter shall be allowed for any item—

(A) Activity.—With respect to an activity ... considered to constitute entertainment ... unless the taxpayer establishes that the item was *directly related to,* or, ... *associated with,* the active conduct of the taxpayer's trade or business....

§ 274(a)(1)(A) (emphasis added). Thus, it can be seen that if either test (*i.e.,* the "directly related" or "associated with") is met in conjunction with § 162, then the entertainment expenditures are deductible, provided again, of course, that they are duly substantiated (§ 274(d)). Moreover, if it is *only* the "associated with" test that is met (with § 162), then in such case the item (of entertainment) must be one "directly preceding or following a substantial and bona fide business discussion." § 274(a)(1)(A).

Treas.Reg. § 1.274–2(c)(2) defines "directly related" as any expenditure for entertainment "that meets the requirements of any one of subparagraphs (3), (4), (5), or (6) of this paragraph." In short, these elements are in the disjunctive; thus, only one needs to be met. We find that neither subparagraphs (5) nor (6) is applicable to the facts here; thus the focus will be whether plaintiff meets *either* subparagraph (3) or (4). Subparagraph (3) contains *requirements* in four subdivisions which are in the conjunctive. Consequently, to meet the subparagraph (3) test of "directly related," plaintiff must, of course, satisfy *all* four criteria of that subparagraph.

Similarly, as with the "directly related" criterion, the "associated with" criterion is defined at § 1.274–2(d)(2); and "directly preceding or following a substantial and bona fide business discussion" is defined at § 1.274–2(d)(3). Our inquiry will now be whether plaintiff has, by a preponderance of the evidence, met one of the foregoing obligatory tests.

D. *Were The 1981 Super Bowl Expenses "Associated With" The Active Conduct Of Plaintiff's Business As Contemplated by § 274?*

If plaintiff had adequately established by probative evidence that subject entertainment expenditures were properly deductible under Code § 162(a), it then, as noted, would have been required to demonstrate that said expenses were either "directly related to" or "associated with" the active conduct of its business. 26 U.S.C. § 274(a)(1)(A). We first address the "associated with" requirement of that statute.

Applicable Treasury regulations provide that expenditures for entertainment *not* directly related to the active conduct of business must be disallowed *unless* the taxpayer demonstrates that the payment was: (i) associated with the active conduct of its business; *and* (ii) the entertainment directly preceded or followed a *substantial and bona fide* business discussion as defined therein. Treas.Reg. § 1.274–2(d)(1)(i) and (ii).[16] *See also St. Petersburg Bank and*

---

**16.** Treas.Reg. §§ 1.274–2(d)(1)(i) and (ii) provide in relevant part:

(d) *Associated entertainment*—(1) *In general.* Except as provided in paragraph (f) of this section (relating to business meals and

*Trust,* 362 F.Supp. at 680. Although § 274's "associated with" test is generally thought of as the more lenient of the two, such test is qualified in that the expense additionally *must* precede or follow a substantial and bona fide business meeting. Otherwise, it is unquestionably not deductible. Treas.Reg. § 1.274–2(d)(1)(ii); *Berkley,* 623 F.2d at 905; *Walliser,* 72 T.C. at 442–43.

The regulations define an associated entertainment expenditure to be one that the taxpayer establishes "had a clear business purpose in making, such as to obtain new business or to continue an existing business relationship." Treas.Reg. § 1.274–2(d)(2); *St. Petersburg Bank and Trust,* 362 F.Supp. at 680. Expenditures attributable to an individual who is closely connected to a person (entity) engaged in said "substantial and bona fide business discussions" are also considered associated with the active conduct of the taxpayer's trade or business. § 1.274–2(d)(2). Thus, expenditures for the spouse of a person who engages in said discussions are *generally* deemed deductible *if* the requirements of the regulations are otherwise *fully* satisfied. Treas.Reg. §§ 1.274–2(d)(2) and (d)(3)(i) and (ii).

Whether a meeting, negotiation, or discussion is substantial and bona fide is to be determined on an ad hoc basis. However, in no event will the deduction be allowed *unless* the taxpayer establishes: (a) that it actively engaged in said business discussions for the purpose of obtaining income or other *specific* trade or business; and (b) that the discussions were *substantial* in relation to the entertainment. Treas.Reg. § 1.274–2(d)(3)(i)(a). Although it is not necessary to establish that more time was devoted to business than to entertainment, the taxpayer bears the burden, nevertheless, of establishing that the *principal* character of the combined activities was

the active conduct of business. Treas.Reg. § 1.274–2(d)(3)(i)(a).

Against this background, we will now determine—whether subject expenditures were associated with the active conduct of Danville's business, and also whether, on these facts, the business discussions were substantial in relation to the entertainment and thus bona fide. However, we are constrained to note that, given the want of probative evidence in the record, this endeavor requires little analysis and discussion. This is true because, *remarkably,* other than a perfunctory assertion in the *table of contents of its post-trial brief,* plaintiff has presented *no credible argument* tending to demonstrate that subject expenditures were "associated with" the active conduct of its business. Such apparent omission was raised by defendant in its post-trial brief, at p. 33; and even more baffling is the fact that plaintiff failed to address this issue in its reply.

Whether plaintiff believed that it was superfluous to its position to address the more *lenient* requirements of the "associated with" test is not for this court to decide. The fact remains that plaintiff bears the affirmative burden of going forward with sufficient evidence to establish: (i) that the Commissioner's determination was incorrect, *Welch,* 290 U.S. at 115, 54 S.Ct. at 9; and (ii) the merits of its claims by a preponderance of the evidence. *Meridian,* 725 F.2d at 1189; *Rockwell,* 512 F.2d at 885. While it is not unreasonable to conclude that plaintiff has voluntarily abandoned that issue, we will, nevertheless, make appropriate findings and conclusions. We will not, however, sift through the record and posture arguments *for the plaintiff* that it did not, in fact, advance for itself.

To be associated with "the active conduct of taxpayer's trade or business," the entertainment must precede or follow a "sub-

---

other specific exceptions) and subparagraph (4) of this paragraph (relating to expenditures closely connected with directly related entertainment), any expenditure for entertainment which is not directly related to the active conduct of the taxpayer's trade or business will not be allowable as a deduction unless—

(i) It was associated with the active conduct of trade or business as defined in subparagraph (2) of this paragraph, and

(ii) The entertainment directly preceded or followed a substantial and bona fide business discussion....

stantial and bona fide" business discussion." First, as previously noted, to have associated entertainment, as defined in § 1.274–2(d)(2), the taxpayer must prove that it "had a clear business purpose in making the expenditure...." We believe and find that the most creditable and telling evidence of the true "business purpose" of the subject expenditures is found in the following three exhibits:

(i) Plaintiff's Exhibit 2, a letter by plaintiff to Abbott Tours, dated June 5, 1980, which refers to the "1981 Super Bowl";

(ii) Plaintiff's Exhibit 3, Abbott Tours' response to plaintiff's letter, which emphasizes "The SUPER SHERATON INTERNATIONAL PACKAGE a deluxe 4–day Super Bowl—1981 package from Jan. 23rd–26th"; and

(iii) Defendant's Exhibit 16, plaintiff's letter (dated January 13, 1981) to its invited customer representatives, which contains the unmistakable purpose of the expenditure, to wit, "Super Bowl weekend is just around the corner."

Plaintiff attempted to establish the fact of this critical element through its president, Mr. Buchanan, and other witnesses, but we do not find their testimony on this issue to be creditable. First, there is the circumstance of when Messrs. Buchanan and McNair arrived in New Orleans. Mr. Sorenson testified that he had business discussions with both of them on Friday, January 23, 1981, when in fact certain documentary evidence, *supra*, establishes that they both arrived in New Orleans sometime on Saturday, January 24, 1981. In our judgment, the foregoing exhibits and the obvious inaccuracies, *supra*, in the testimony and other evidence as to the arrival date of Messrs. Buchanan and McNair, which substantially taint the credibility of plaintiff's major witnesses, are sufficient bases for this court to find that plaintiff has failed to rebut the presumption of correctness and prove this element by a preponderance of the evidence.

We also find that plaintiff's proffered evidence, discussed, *supra*, relative to the existence of "substantial and bona fide" business discussions, is also legally defi-

cient. Treas.Reg. § 1.274–2(d)(3), in defining that phrase, states that it:

... depends upon the facts and circumstances of each case.... In addition, it *must* be established that such a business meeting, negotiation, discussion, or transaction was substantial in relation to the entertainment. This requirement will be satisfied if the *principal character* ... of the combined entertainment and business activity was the active conduct of business.

(emphasis added). *Bona fide* is defined in *Black's Law Dictionary* (p. 160, 5th ed. 1979) to mean—real, actual, genuine, and not feigned, in or with good faith. Given the particular facts and circumstances as found, we are compelled to hold that, to the extent that there were casual business discussions during the Super Bowl weekend, they were neither substantial nor bona fide within the contemplation of the Code and regulations.

Therefore, we unequivocally conclude, on all of the facts and circumstances, that the putative business meetings held were *not* "substantial in relation to the entertainment" and that the "principal character" of the activity was *not* the active conduct of the plaintiff's business.

In summary, and without revisiting the findings relative to the nature of the meetings/discussions, this record shows that:

(i) No general business meeting was held;

(ii) The Saturday dinner meeting was held in an open hotel dining room which accommodated the hotel's guests and the public at large;

(iii) No more than 15 customer representatives were identified by name as having been talked to by plaintiff's sales people;

(iv) Only two of plaintiff's sales employees testified as to business discussions;

(v) The testimony of these two sales employees was, at best, general, vague, conclusory, and apparently self-serving;

(vi) Mr. Duncan, plaintiff's sales representative, did not testify; nor did plaintiff,

through Mr. Buchanan, explain the reason for such failure;

(vii) Practically all of the alleged business discussions occurred in the hospitality area of the hotel lobby, the bar lounge, and in or around the hotel;

(viii) Mr. Sorenson testified that business discussions were held "wherever we found George ... and where ever we could catch him" (Tr. 235, 243); and

(ix) Mr. Sorenson's revelation was typical of the testimony of all of plaintiff's witnesses.

Accordingly, we hold as a matter of law that the presumption of correctness that attached to the Commissioner's determination has not been rebutted with respect to whether subject expenditures were "associated with" the active conduct of plaintiff's business. *Welch,* 290 U.S. at 115, 54 S.Ct. at 9. Specifically, we hold that under § 274(a)(1)(A), plaintiff has *failed* to establish that: (i) any of the expenditures incurred, in connection with attendees to the Super Bowl, were associated with the active conduct of Danville's business, Treas. Reg. § 1.274–2(d)(1)(i); (ii) the Super Bowl occurred on the same day as did substantial and bona fide business meetings, negotiations or discussions, Treas.Reg. § 1.274–2(d)(3)(ii); (iii) the expenditures were incurred directly preceding or following a substantial and bona fide business discussion, Treas.Reg. § 1.274–2(d)(3)(i); or (iv) the expenditures were *not* in the nature of non-deductible good will entertainment, *Hippodrome Oldsmobile,* 474 F.2d at 961. We, therefore, turn our attention to the more stringent requirements of the "directly related" test.

E.  *Were The 1981 Super Bowl Expenditures "Directly Related To" The Active Conduct Of Plaintiff's Business As Contemplated By § 274?*

■■■ In general, as hereinbefore noted, the "directly related" test of § 274 requires

that the taxpayer illustrate a closer nexus between an expenditure and the taxpayer's trade or business than that required by § 162. H.R.Rep. 1447, *supra,* 1962–3 Cum. Bul. at 424. Treas.Reg. § 1.274–2(c)(2), enacted pursuant thereto, explains that to meet the "directly related" test the taxpayer must meet the requirements of subparagraphs (3), (4), (5), or (6) thereof.[17] As previously noted, subparagraphs (5) and (6) are not applicable to the facts at bar; thus, we will address, seriatim, whether plaintiff has satisfied subparagraphs (3) or (4), by a preponderance of the evidence.

In order to satisfy the regulatory mandates of subparagraph (3) of § 1.274–2(c), the taxpayer *must* meet *each* of the four requirements embodied therein, to wit:

(i) At the time the taxpayer made the entertainment expenditure (or committed himself to make the expenditure), the *taxpayer had more than a general expectation of deriving some income* or other specific trade or business benefit (other than the good will of the person or persons entertained) at some indefinite future time from the making of the expenditure. § 1.274–2(c)(3)(i);

(ii) During the entertainment period to which the expenditure related, *the taxpayer actively engaged in a business meeting,* negotiation, discussion, *or other bona fide business* transaction, other than entertainment, for the purpose of obtaining such income or other specific trade or business benefit (or at the time the taxpayer made the expenditure, it was reasonable for the taxpayer to expect that it would have done so). § 1.274–2(c)(3)(ii);

(iii) In light of all the facts and circumstances of the case, the *principal character or aspect of the combined business and entertainment* to which the expenditure related was *the active conduct of the taxpayer's trade or business* (or at the time the taxpayer made the expenditure, it was reasonable for the taxpayer to expect

---

**17.** Treas.Reg. § 1.274–2(c)(2) provides as follows:

(2) *Directly related entertainment defined.* Any expenditure for entertainment, if it is otherwise allowable as a deduction under

chapter 1 of the Code, shall be considered directly related to the active conduct of the taxpayer's trade or business if it meets the requirements of any one of subparagraphs (3), (4), (5), or (6) of this paragraph.

that the active conduct of trade or business would have been the principal character of the entertainment). § 1.274–2(c)(3)(iii); and

(iv) The expenditure was allocable to the taxpayer and a person or persons with whom the taxpayer engaged in the active conduct of trade or business during the entertainment (or with whom the taxpayer establishes he would have engaged in such active conduct of trade or business if it were not for circumstances beyond his control). § 1.274–2(c)(3)(iv).

Because we find that plaintiff has failed to meet subparagraphs (i), (ii), and (iii), *supra*, we hold it to be unnecessary to address subparagraph (iv).

First and foremost, regarding the subparagraph (3)(i) requirements, the evidence does not support plaintiff's contention that at the time it *incurred* subject expenditures, it had a specific (and "more than a general") expectation of deriving income at some indefinite time in the future. The following circumstances lead the court to these conclusions: (1) price was a major factor in whether a customer decided to purchase from Danville, Tr. 214, 239–40, 261; and (2) it was clear that Danville's prices fluctuated often and at least on a monthly basis, Tr. 122.

Secondly, with respect to subparagraph (3)(ii), *supra,* plaintiff failed to prove (as previously found), by a preponderance of the evidence, that it actually engaged in *bona fide* business discussions with *each* invitee, or even a substantial number thereof, for the purpose of obtaining specific increased business or other benefit. The carnival (Mardi gras) atmosphere surrounding the environment in which the alleged business discussions were held belies the bona fides of their existence. In short, we are not convinced by the plaintiff's assertions. Given the totality of the circumstances on this record, we find that it strains credulity to contend, as does plaintiff, that it was reasonable for the taxpayer to expect that it (through the noted employees) would engage in bona fide business meetings. We base this on the reasonable inferences deducible from Plaintiff's Exhibits 2 and 3 and Defendant's Exhibit 16,

which exclusively addressed nothing but the amenities available with respect to the 1981 "Super Bowl weekend."

Thirdly, with regards to subparagraph (3)(iii), the principal character of the program, combined with the entertainment aspects of same, cannot, on this record, *supra*, be found to have been the active conduct of Danville's business. It is clear beyond doubt that the attendees were advised by letter that the *sole* (not principal) character of the activity in New Orleans was *to attend the 1981 Super Bowl game. See* Pltf's Ex. 2 and Deft's Ex. 16, *supra.*

Finally, we address the question of whether plaintiff can meet the requirements of Treas.Reg. § 1.274–2(c)(4). Thereunder, entertainment expenditures shall be considered "directly related" to the active conduct of the taxpayer's business *if:*

> [I]t is established that the expenditure was for entertainment occurring in a *clear business setting* directly in furtherance of the taxpayer's ... business. Generally, entertainment shall not be considered to have occurred in a clear business setting *unless* the taxpayer *clearly* establishes that any recipient of the entertainment would have reasonably known that the taxpayer had no significant motive in incurring the expenditure, other than directly furthering his ... business. Objective rather than subjective standards will be determinative.

§ 1.274–2(c)(7)(i) (emphasis added). The foregoing provision *requires* the taxpayer to clearly and objectively establish that: (i) such expenditure occurred in a clear business setting directly in furtherance of the taxpayer's business; and (ii) the recipient of the entertainment would have reasonably known that the taxpayer had no significant motive for incurring the cost, *other than* to directly further his (the taxpayer's) business. Treas.Reg. § 1.274–2(c)(4).

Subparagraph (4) further provides that "entertainment which occurred under any circumstances described in subparagraph (7)(ii) ... will not be considered as occurring in a *clear business setting.* Such entertainment will ... be considered social-

ly rather than commercially motivated." That subparagraph provides that a clear business setting does not exist where the distractions were substantial. By way of illustration and not by limitation, the examples given are:

(a) a meeting or discussion at night clubs, sporting events, or during essentially social gatherings; or

(b) if the taxpayer meets with a group which includes persons other than business associates at places such as cocktail lounges, etc.

To the above, we add that the record shows that the distractions at bar extended to the Saturday dinner meeting which was in an open hotel dining room; persons other than business associates were present in that meeting; practically all of the alleged meetings, etc. were held in the open Mardi gras atmosphere of the hotel lobby, in the cocktail lounge, and in and around the open public places of the hotel wherever plaintiff's employees could be found.

We find that these circumstances clearly prevent a finding of the existence of a "clear business setting," and plaintiff has failed to clearly establish to the contrary.

Against these strict regulatory requirements, we conclude that the Commissioner properly determined that subject entertainment expenditures were not directly related to the active conduct of Danville's business. It takes little imagination to see, on this record, the obvious fact that the putative seminar belies the threshold purport of Plaintiff's Exhibits 2 and 3 and Defendant's Exhibit 16. Such a situation, where there is little possibility of engaging in substantial and bona fide business discussions, is expressly considered *not* directly related to business by applicable regulations. § 1.274–2(c)(7)(i). We see no reason to except Danville's "Super Bowl weekend" from this general provision.

Accordingly, we hold that the Super Bowl program conducted by Danville during the weekend of January 23 through 26, 1981, was, as a matter of law, neither directly related to nor associated with the active conduct of its business, and, therefore, said expenditures relative thereto were exclusively social and properly disallowed by the Commissioner. Inasmuch as we conclude that plaintiff failed to establish entitlement to subject deductions under both § 162(a) and § 274, we need not address substantiation requirements relative to these expenditures.

CONCLUSION

For the reasons stated herein, the instant complaint is DISMISSED with prejudice. The Clerk shall enter judgment accordingly. Costs shall be assessed against the plaintiff.

IT IS SO ORDERED.